(Nos. 71791, 77379 cons.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN E. WHITEHEAD, Appellant.

*Opinion filed February 15, 1996.—Rehearing denied April 1, 1996.*

HARRISON, J., took no part.
MILLER, J., specially concurring.

Vincent D. Pinelli, Patrick J. Cullinan and John C. Greenlees, all of Chicago, for appellant.

Roland W. Burris and James E. Ryan, Attorneys

General, of Springfield (Rosalyn B. Kaplan and Barbara A. Preiner, Solicitors General, and Terence M. Madsen, Michael M. Glick, Steven J. Zick and Arleen C. Anderson, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Grundy County, defendant, John E. Whitehead, was convicted of murder and aggravated kidnapping (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1, 10—2) and sentenced to death and a term of 30 years' imprisonment. On direct appeal, this court affirmed defendant's convictions and sentences. (*People v. Whitehead* (1987), 116 Ill. 2d 425.) The United States Supreme Court later denied a petition for a writ of *certiorari* (*Whitehead v. Illinois* (1987), 484 U.S. 933, 98 L. Ed. 2d 266, 108 S. Ct. 307) and a petition for rehearing (*Whitehead v. Illinois* (1988), 484 U.S. 1021, 98 L. Ed. 2d 685, 108 S. Ct. 737). Over a period of years, defendant filed several amended petitions under the Post-Conviction Hearing Act (Act) (Ill. Rev. Stat. 1981, ch. 38, par. 122—1 *et seq.*) in the circuit court of Grundy County. Subsequent to the trial court's dismissal of the second-amended petition, defendant filed notice of direct appeal to this court. During the pendency of that appeal, the trial court dismissed a third-amended petition and defendant again filed notice of direct appeal to this court. We have consolidated the appeals. (134 Ill. 2d R. 366(a).) For reasons which follow, we affirm.

## FACTS

The factual details surrounding the murder and aggravated kidnapping of five-year-old Vickie Wrobel are recounted in *Whitehead*, 116 Ill. 2d 425. The State's evidence against defendant included eight statements by defendant, oral, written and tape-recorded, in which he

admitted kidnapping, sexually assaulting and killing the Wrobel child. Defendant's statements were in turn corroborated by a multitude of physical and circumstantial evidence. We present only those facts necessary to resolve issues relevant to this post-conviction appeal.

## STANDARD OF REVIEW

On review of matters decided under the Post-Conviction Hearing Act, determinations of the trial court will not be disturbed unless manifestly erroneous. See *People v. Silagy* (1987), 116 Ill. 2d 357, 365.

## PROCEDURAL BACKGROUND

On May 25, 1988, defendant filed a *pro se* petition under the Post-Conviction Hearing Act in the circuit court. With the assistance of appointed counsel, defendant later filed an amended petition and a second-amended post-conviction petition and an addition. The second-amended petition claimed a violation of the right to the effective assistance of counsel (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8) in that trial counsel: mishandled the defenses of insanity, intoxication and reasonable doubt; failed to adequately preserve a record of error; failed to vigorously argue, present or investigate available evidence in support of a reasonable doubt defense; failed to object to improper prosecutorial remarks; and was provided no capable assistance to investigate or develop mitigation evidence for sentencing. The addition to the petition claimed that separate appellate counsel was ineffective for failing to raise on direct appeal the ineffective assistance of trial counsel. Defendant's affidavit and the affidavit of Wayne M. McFarland, his trial counsel, were attached to the second-amended petition.

On February 7, 1991, the trial court dismissed the second-amended petition and addition, without an evidentiary hearing, finding that the claim of trial counsel's

ineffectiveness was waived for failure to raise it on direct appeal. The trial court additionally ruled that both trial and appellate counsel assisted effectively. Before entry of the judgment, defendant unsuccessfully requested that the ruling be stayed to allow him to file an amended pleading with the assistance of the Capital Resource Center, a recently created branch of the Illinois State Appellate Defender's office. Post-conviction counsel indicated that they had just become aware of the Center's existence and that it provides investigative services and mitigation and capital defense expertise. Defendant subsequently filed a motion for reconsideration, asserting that the trial court had limited the investigative resources available to post-conviction counsel by declining to rule that they might obtain reimbursement of their costs; asserting that the second-amended petition was incomplete; and requesting 120 days to utilize the resources of the Capital Resource Center to supplement the petition. The trial court denied the motion for reconsideration. On April 24, 1991, defendant filed notice of appeal from the dismissal of the second-amended petition with addition and the denial of the motion for reconsideration. 134 Ill. 2d Rules 603, 651(a).

On November 13, 1991, defendant filed a third-amended post-conviction petition in the circuit court of Grundy County with the assistance of the Capital Resource Center. The third-amended petition claimed a violation of the sixth amendment right to an impartial jury (U.S. Const., amend. VI) because several jurors had become upset and complained to the clerk of the circuit court during the trial that their names and addresses had been published in the local newspaper, and the jury had also witnessed an emotional outburst by the victim's mother from the witness stand. The petition also claimed a violation of due process (U.S. Const., amend. XIV) because one juror revealed that, before evidence

was presented at trial, he had conceptualized defendant as being equipoised on a gradated scale extending between unequivocal guilt and unequivocal innocence. The petition also repeated the second-amended petition's claims of trial and appellate counsel's ineffective assistance. Defendant supplemented his previous claim concerning trial counsel's ineffectiveness with the additional claim that trial counsel's handling of the insanity defense resulted in defendant's inability to testify in support of the reasonable doubt defense. Defendant also supplemented his arguments against procedural default of the claims. The affidavits of various individuals with legal and mitigation expertise were attached to the third-amended petition.

On November 13, 1991, defendant filed a motion in this court requesting a stay of the appeal, pending disposition of the third-amended petition. On November 19, 1991, this court stayed the appeal, and later extended the stay to April 19, 1992. A further extension was later denied. On June 8, 1992, defendant filed his initial appellate brief. The State responded by brief on September 14, 1992. On December 1, 1992, defendant filed a reply brief.

On May 15, 1992, the State answered the third-amended petition. In September 1992, the trial court set the matter for hearing when the State did not move to dismiss. The trial court later granted leave to file a motion to dismiss. In addition to arguing primarily the merits, the motion stated that the due process and right to impartial jury claims in the third-amended petition were waived by defendant's failure to raise them on direct appeal or in prior post-conviction petitions. Defendant responded that the prior post-conviction pleadings were dismissed for procedural default, their merits not having been addressed. Accordingly, the petition's dismissal should not form the basis for waiver of ad-

ditional issues. Moreover, defendant contended that he was not reasonably and adequately assisted in preparing the second-amended petition (see *People v. Wright* (1992), 149 Ill. 2d 36, 64; *People v. Owens* (1990), 139 Ill. 2d 351, 364), as demonstrated by comparing the petitions and their support as well as by appointed counsel's requests to file a third-amended petition utilizing the assistance of the Capital Resource Center. Defendant additionally pointed out that successive petitions have been allowed where prior proceedings were fundamentally deficient.

On December 12, 1992, the trial court dismissed the third-amended petition finding that most of the claims, including that of trial counsel's ineffective assistance and the violations of the right to impartial jury and due process, were waived for failure to raise them on direct appeal. The trial court found that the claim of appellate counsel's ineffective assistance was sufficient to warrant an evidentiary hearing and that there had been no previous opportunity to raise that claim. The trial court additionally entered findings that previous post-conviction pleadings had been dismissed on procedural grounds and that defendant had asserted that his representation in those proceedings was inadequate. On April 29, 1994, after a hearing concerned with the effective assistance of appellate counsel, the trial court denied the petition. On June 13, 1994, defendant filed notice of appeal from the denial of the third-amended petition, and on August 22, 1994, we consolidated the appeals (134 Ill. 2d R. 366 (a)).

At this juncture, we note that the Post-Conviction Hearing Act allows for amendment of a post-conviction petition (see Ill. Rev. Stat. 1981, ch. 38, par. 122—5), yet contemplates the filing of one post-conviction petition (see Ill. Rev. Stat. 1981, ch. 38, par. 122—3; see also

*People v. Flores* (1992), 153 Ill. 2d 264, 274). Section 122—3 provides that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." (Ill. Rev. Stat. 1981, ch. 38, par. 122—3.) Consistent with section 122—3, this court has held that a ruling on a post-conviction petition has *res judicata* effect with respect to all claims that were raised or could have been raised in the initial petition. (*People v. Free* (1988), 122 Ill. 2d 367, 375-76; see also *Flores*, 153 Ill. 2d at 274.) Nonetheless, section 122—3 is not an ironclad bar to multiple post-conviction petitions. (*Free*, 122 Ill. 2d at 376.) The filing of successive petitions has been allowed where the proceedings on the initial petition were deficient in some fundamental way. (See *Flores*, 153 Ill. 2d at 273-74 (citing cases); *Free*, 122 Ill. 2d at 376 (citing cases).) Further, this court has also held that the objective of finality must yield in circumstances where fundamental fairness so requires. See *People v. Slaughter* (1968), 39 Ill. 2d 278, 285.

The procedural circumstances of this case are somewhat unusual. It is not clear that the trial court construed the third-amended petition as a separate and successive petition. The trial court ruled on issues it had previously decided. Also, when presented with the opportunity to find remaining issues waived on the basis of a successive filing, the trial court specifically declined to do so. Defendant's first appeal before this court also apparently remained dormant for three years during the pendency of the proceedings on the third-amended petition and is now consolidated. Consequently, in our view, given these unusual circumstances and to ensure that defendant obtains one complete opportunity to show a substantial denial of constitutional rights (*cf. People v. Logan* (1978), 72 Ill. 2d 358), the third-amended petition stands.

## ANALYSIS

## I.

### Ineffective Assistance Of Trial Counsel At Trial And Sentencing

Defendant initially argues that he sufficiently alleged meritorious claims, asserting the ineffective assistance of trial counsel, in both his second- and third-amended petitions. Defendant contends the trial court erred in dismissing the claims of ineffectiveness of trial counsel on the basis of waiver for failure to raise them on direct appeal. Defendant asserts the claims were not waived for either or both of two reasons: (1) either the claims were supported by facts outside the record; and/or (2) separately appointed appellate counsel rendered ineffective assistance by not raising the claims on direct appeal. Defendant additionally asserts that the trial court erred in dismissing his second-amended petition and the claims of trial counsel's ineffectiveness raised in the third-amended petition without holding an evidentiary hearing.

The Post-Conviction Hearing Act (Ill. Rev. Stat. 1981, ch. 38, par. 122—1 *et seq.*) provides a remedy to criminal defendants who claim that substantial violations of constitutional rights occurred in their trial (*People v. Owens* (1989), 129 Ill. 2d 303, 307). A proceeding under the Act is not an appeal, but a collateral attack on a judgment. (*People v. James* (1986), 111 Ill. 2d 283, 290.) The purpose of the proceeding is to permit inquiry into constitutional issues involved in the original conviction that have not already been adjudicated or could not have been. (*Silagy*, 116 Ill. 2d at 365; see also *People v. Gaines* (1984), 105 Ill. 2d 79, 87.) The burden is on the defendant to establish a substantial deprivation of constitutional rights.

A defendant filing a post-conviction petition is not

entitled to an evidentiary hearing as a matter of right. (Ill. Rev. Stat. 1981, ch. 38, par. 122—6; see *Silagy*, 116 Ill. 2d at 365.) An evidentiary hearing should be conducted when the petitioner makes a "substantial showing of a violation of constitutional rights," which means that the petition's allegations must be supported by the record or by accompanying affidavits. (*Silagy*, 116 Ill. 2d at 365.) Denial of an evidentiary hearing is, however, a matter of discretion, and the trial court's decision will not be reversed absent such an abuse. See *People v. Hanrahan* (1985), 132 Ill. App. 3d 640, 641.

## A. Waiver

The Act also provides that any claim of a substantial denial of constitutional rights not raised in the original or an amended petition is waived. (Ill. Rev. Stat. 1981, ch. 38, par. 122—3.) Further, a defendant may not prevail in a post-conviction proceeding on constitutional claims which he has previously waived. (*People v. Eldredge* (1969), 41 Ill. 2d 520.) Furthermore, it is well established that determinations of the reviewing court on the prior direct appeal are *res judicata* as to issues actually decided and issues that could have been presented on direct appeal, but were not, are deemed waived. (See *People v. Albanese* (1988), 125 Ill. 2d 100, 105; *Silagy*, 116 Ill. 2d at 365; *People v. French* (1970), 46 Ill. 2d 104.) The application of the waiver rule is not, however, a jurisdictional or absolute bar to review of procedurally defaulted claims, but is rather a rule of administrative convenience. (See *People v. Owens* (1989), 129 Ill. 2d 303, 317.) Thus, the strict application of *res judicata* and waiver will be relaxed "where fundamental fairness so requires." (*People v. Gaines* (1984), 105 Ill. 2d 79, 91; *People v. Hamby* (1968), 39 Ill. 2d 290, 291.) Further, where the alleged waiver stems from incompetency of appointed counsel on appeal, the doctrine is also relaxed. (*People v. Barnard* (1984), 104 Ill. 2d 218, 229;

*People v. Frank* (1971), 48 Ill. 2d 500, 503.) The rule is also relaxed in instances where the facts relating to the claim do not appear on the face of the original appellate record (see *People v. Eddmonds* (1991), 143 Ill. 2d 501, 528; see also *People v. Thomas* (1967), 38 Ill. 2d 321 (holding *res judicata* does not preclude consideration of constitutional questions in post-conviction proceedings which, by their nature, depended upon facts not found in record)) and could not have been supplemented to that record under Supreme Court Rule 329 (134 Ill. 2d R. 329; see *People v. Jones* (1985), 109 Ill. 2d 19, 23). Obviously, a claim may survive the bar of waiver on the basis of any one of these three well-established exceptions.

With respect to the third exception, as a matter of clarification, it is not so much that such a claim "could not have been presented" or "raised" by a party on direct appeal, but rather that such a claim could not have been *considered* by the reviewing court because the claim's evidentiary basis was *de hors* the record. (*Cf. People v. Hall* (1993), 157 Ill. 2d 324, 336 (stating that defendant could not have "raise[d]" issue in direct appeal since affidavits supporting issue not part of record); *People v. Cobb* (1986), 150 Ill. App. 3d 267, 270.) Thus, the exception recognizes that waiver ought not to preclude that species of claim which, though theoretically capable of being "presented" on appeal, is nonetheless incapable of consideration by a reviewing court because of rules governing the scope of appellate review. (See *People v. Edwards* (1978), 74 Ill. 2d 1, 7 (reviewing court restricted in examination to record); *People v. Anthony* (1963), 28 Ill. 2d 65, 70 (matters not of record cannot be considered on appeal).) Further, the exception saves those claims irrespective of whether their supporting facts are available as a practical matter at the time of the direct appeal. The recent decisions of *People v.*

*Erickson* (1994), 161 Ill. 2d 82, and *People v. Thomas* (1995), 164 Ill. 2d 410, do not change these rules. That factual information presented in documents in support of a post-conviction petition was not made a part of the trial record "explains" why the claim could not have been presented for consideration on direct appeal.

In the appellate brief arguing the merits of the second-amended petition and its addition, defendant conceded that "some" of the claims of trial counsel's ineffectiveness were apparent from the record. Defendant argued only that the claim concerning the reasonable doubt defense, trial counsel's failure to vigorously argue and present or investigate available evidence, and the claim concerning trial counsel's ineffectiveness at sentencing, counsel's incapacity to investigate and develop mitigation evidence, were dependent on matters *de hors* the record. In the appellate brief in support of the third-amended petition, defendant apparently takes the position that all of the ineffectiveness claims, with the exception of trial counsel's failure to object to improper prosecutorial comments, and failure to preserve a record of error, are dependent upon facts outside the record. According to defendant, virtually all of the ineffectiveness claims survived the bar of waiver on that basis and should not have been dismissed without a hearing.

The State argues that the ineffectiveness claims were nonetheless waived under this attempted exception unless their factual support also "explains" why the claims could not have been raised on direct appeal. See *Thomas*, 164 Ill. 2d 410.

We first consider whether defendant's ineffectiveness claims survived waiver based on the exception made for claims dependent upon facts outside the record.

Defendant was represented at trial by McFarland,

the public defender of Grundy County, and John V. Hanson, an assistant public defender, who was appointed by the court to assist McFarland. Defendant's second- and third-amended petitions claimed that trial counsel was ineffective for mishandling the defenses of insanity, intoxication and reasonable doubt.. Specifically, defendant claimed that trial counsel presented defenses that were inconsistent, insanity or intoxication along with reasonable doubt, and then without sound strategy they abandoned the insanity defense. Defendant claimed that the abandonment of the insanity defense resulted in defendant's inability to testify to offer the best evidence of an intoxication defense and the only available evidence of the circumstances surrounding his many statements to police.

In support of these interrelated arguments, defendant included with the third-amended petition the affidavits of several persons. James P. Carey, a professor of criminal law, Randolph N. Stone and Howard L. Weitzman, criminal law specialists, and Roger J. Kiley, a former trial judge, attested to their opinions that presenting a reasonable doubt defense and either an insanity or intoxication defense is fundamentally unsound and would prevent the rendition of effective assistance of counsel; and that the breach of a promise to call witnesses or present certain defenses is ineffective assistance of counsel *per se* or can seriously undermine a defense counsel's credibility. Linda Meza, a social psychologist and trial consultant, expert in jury selection procedures, reviewed the *voir dire* of the jury and opening statements. Meza attested to her opinion regarding trial counsel's *voir dire* questioning concerning insanity and intoxication defenses, and the effect upon the jurors of that questioning and counsel's failure to present any insanity evidence.

Following dismissal of the claims of trial counsel's

ineffectiveness, the trial court held the hearing concerning the claim of appellate counsel's ineffectiveness. At the hearing, Professor Carey testified that when he previously made his affidavit, he had not known anything about defendant's case. Carey testified that since that time, he had reviewed the opening and closing statements of both parties. Carey testified that in his opinion simultaneously presenting a reasonable doubt defense and an insanity defense constitutes ineffective assistance of counsel, and that the State's closing argument in the case illustrated the adverse consequences of doing so. Carey also testified that trial counsel's presentation of both theories in opening and closing arguments represented defective performance.

Kyle Wesendorf, a criminal appeals attorney employed by the Cook County public defender, testified that she had reviewed the entire trial record. Wesendorf was asked whether she would have raised on appeal the issue of trial counsel's ineffectiveness. In response, Wesendorf testified that, in this case, in her opinion, trial counsel's presentation of the defenses of insanity or intoxication and reasonable doubt constituted ineffective assistance of counsel because the defenses were done badly. Wesendorf additionally testified that in her opinion the failure here to present evidence of insanity also constituted ineffective assistance of counsel.

We do not find that defendant's claim of trial counsel's ineffectiveness in handling the insanity, intoxication and reasonable doubt defenses "depended upon" facts found in these affidavits. (*Thomas*, 38 Ill. 2d at 324.) This particular ineffectiveness claim depended no more on these affidavits than on other written legal opinion concerning matters of law that was available for consideration by this court on direct appeal. Like the trial court in *People v. Eddmonds* (1991), 143 Ill. 2d 501, 537, we do not find that this particular proffered in-

formation necessarily assists in determining whether trial counsel performed competently any more than that information already apparent of record. The proffered information consists merely of expert opinion critiqueing what trial counsel did, in fact, do at trial as opposed to what information trial counsel ought to have investigated or presented. The underlying purpose of the exception recognized in *Thomas* was to permit post-conviction review of matters which were unreviewable on direct appeal because those matters depended upon facts not within the trial record. This particular ineffectiveness claim, that trial counsel mishandled the three defenses, does not depend on the fact that an expert believes that to be the case. Accordingly, the ineffectiveness claim arguing the mishandling of defenses cannot survive waiver on this basis. Notably, the arguments forming this claim are those that defendant previously conceded were dependent upon facts apparent of record.

Defendant also claimed that trial counsel failed to deliver on a promise to the jury to present evidence of reasonable doubt and failed to vigorously argue, present or investigate available evidence in support of the reasonable doubt defense. Defendant contended that, because of the State's evidence, trial counsel intended to rely at trial primarily on insanity and intoxication defenses. Defendant contended that because of this focus, trial counsel failed to vigorously pursue a reasonable doubt defense even though counsel was aware of many facts and circumstances pointing to its viability. According to defendant, trial counsel did not utilize admitted evidence to "communicate" to the jury that William Starbuck or someone else committed the crime and "unreasonably ignored opportunities to weave the facts together" into a reasonable doubt defense.

In addition, trial counsel allegedly failed to present or elicit evidence that he and LeAllen Starbuck had

been sexually involved; that she was pregnant with his child; and that William Starbuck, her husband, had access to Esther Harmon's car keys and defendant's shirt, found in the Mazon River. Defendant also claimed that trial counsel did not present hydrology evidence that was promised in the opening statement and evidence of the involuntariness of his statements and was not provided adequate investigative assistance to discover evidence concerning an unidentified handwritten address found on a note in the pocket of his shirt and other unspecified, exculpatory evidence from William Starbuck. In support of this ineffectiveness claim, defendant attached his own and McFarland's affidavits which spoke primarily to the claimed failures to present certain evidence, not the failures to vigorously argue, communicate, and highlight evidence to the jury.

In his affidavit, defendant stated that, although he told trial counsel that LeAllen had said she was pregnant with defendant's child and trial counsel assured him that proof of that fact could be presented at trial, trial counsel did not obtain and present that evidence. In contrast, however, neither defendant nor McFarland clearly stated in his affidavit what evidence was available to show that William Starbuck had access to Harmon's keys and defendant's shirt beyond the already admitted evidence that defendant and Starbuck resided in the same house. Moreover, while McFarland's affidavit provided much new information from outside the record concerning the inadequacy of the investigative assistance he had received, neither affidavit identified the information defendant expected to recover from an investigation of Starbuck or the unidentified written address on the note. Also, it is apparent of record that trial counsel actually hired a hydrologist who conducted tests of the Mazon River, but the results were neither supportive of the defense nor damaging to the State. It

is also apparent from the record, in proceedings on the motion to suppress, what evidence defendant would have likely provided if he had been called to testify regarding the circumstances of his statements to police. Nonetheless, despite these deficiencies, we cannot dispute that the affidavits contained information outside the record generally supporting the claim concerning argument and evidence of reasonable doubt. Accordingly, this ineffectiveness claim was not waived.

Defendant additionally claimed that he was provided ineffective assistance at sentencing because trial counsel was unable and did not attempt to investigate and present available mitigation evidence. At trial, counsel had requested the appointment of expert assistance, in the nature of a social psychologist or social worker, to develop mitigation evidence. The trial court had denied the request, ruling that such development could be done by an attorney or by William Sulkey, the investigator assigned to the case. Defendant's and trial counsel's affidavits also supported this claim.

In his affidavit, defendant stated that trial counsel had advised him that it would be most advantageous if he called at sentencing as few mitigation witnesses as possible. McFarland recounted the many difficulties he experienced obtaining adequate investigation from Sulkey, and stated that Sulkey did not possess the necessary skills, knowledge or expertise to function as the mitigation expert he had requested.

The affidavits of Dr. Linda C. Wetzel, a psychologist, Dr. Michael Levins, a psychologist, and Cynthia Hines, a mitigation specialist, were attached to the third-amended petition. Wetzel reviewed defendant's electroencephalogram (EEG), his mental health, other personal background records, and other materials related to the case. Wetzel concluded that there was a likelihood that defendant suffered from Episodic Dyscontrol associated

with a partial complex seizure disorder. Her affidavit referred to this condition as a brain disease. Levins reviewed similar materials, interviewed defendant, diagnosed him as a pedophiliac, and concluded it was possible that defendant had an organic brain impairment. Wetzel and Levins stated that they were requested by Hines to evaluate defendant's background and condition. Hines stated that she also reviewed similar materials and interviewed two of defendant's sisters. Hines' affidavit summarized information she had learned concerning defendant's dysfunctional background.

We conclude that the claim of ineffectiveness of assistance at sentencing very clearly depended upon information within these affidavits which was not within the trial record. Therefore, this ineffectiveness claim also was not waived.

To summarize, the ineffective assistance claims concerning trial counsel's (i) argument and presentation of evidence of reasonable doubt and (ii) incapacity to develop mitigation evidence were not waived under the exception for claims dependent upon facts outside the record. These claims ought not to have been dismissed and should have been decided on their merits. The ineffective-assistance claim concerning trial counsel's handling of the defenses, however, did not survive waiver on this basis.

Accordingly, we complete our waiver analysis by considering whether appellate counsel rendered ineffective assistance by not raising that claim on appeal. In assessing appellate counsel's performance in this regard, we must also consider two other arguments defendant raised concerning trial counsel's assistance: trial counsel's alleged failure to preserve a record of error and their failure to object to improper prosecutorial remarks during closing argument. Defendant apparently takes the position that these arguments were not

waived due to appellate counsel's failure to raise them on direct appeal.

Defendant claimed that trial counsel's handling of the defenses of insanity, intoxication and reasonable doubt was equivalent to no defense at all. According to defendant, trial counsel did not function as that counsel guaranteed by the sixth amendment (U.S. Const., amend. VI). Defendant contended that trial counsel presented the jury with logically inconsistent defenses of insanity or intoxication and reasonable doubt. Defendant asserts that while the affirmative defenses of insanity or intoxication necessarily admit the commission of the charged acts, but not the requisite state of mind, a reasonable doubt defense asserts that the defendant did not commit the acts or that the prosecution's evidence is insufficient to prove defendant's commission of the crime. Defendant claims that trial counsel "presented" these two defenses to the jury by "condition[ing]" prospective jurors during *voir dire* to expect these defenses at trial and by his statements in opening argument.

The *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, two-part test of effective assistance of counsel was adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504. Under the test, a defendant must establish that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, were it not for counsel's unprofessional errors, the result of the proceeding would have been different. (*Albanese*, 104 Ill. 2d at 525.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*Albanese*, 104 Ill. 2d at 525.) The deficiency in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance. See *Barnard*, 104 Ill. 2d at 233.

A court need not decide the performance component

of an ineffective-assistance claim before analyzing the prejudice component, since an insufficient showing on either will defeat the constitutional claim. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed. (*Gaines*, 105 Ill. 2d at 93.) However, determining the prejudice component entails more than applying an outcome-determinative test. The defendant must show that counsel's performance rendered the result of the trial unreliable or the proceeding funda-mentally unfair. (*People v. Mahaffey* (1995), 165 Ill. 2d 445, 458.) Resolution of such claims, based only on the prejudice component, involves looking at the findings unaffected by error, accounting for the effect of error on remaining findings and answering, in the end, whether the decision would " 'reasonably likely' " have been different. *Erickson*, 161 Ill. 2d at 90, quoting *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2068-69.

The *Strickland* test is also utilized in reviewing the performance of appellate counsel. (See *People v. Caballero* (1989), 126 Ill. 2d 248, 269-70.) A defendant who contends that appellate counsel rendered ineffective assistance, for example, by failing to argue a particular issue, must show that " 'the failure to raise that issue was objectively unreasonable' " and that, " 'but for this failure, his sentence or conviction would have been reversed.' " (*People v. Flores* (1992), 153 Ill. 2d 264, 283, quoting *Caballero*, 126 Ill. 2d at 270.) There is no obligation of appointed appellate counsel to brief every conceivable issue on appeal, and it is not incompetence of counsel to refrain from raising issues which, in his judgment, are without merit, unless his appraisal of the merits is patently wrong. *People v. Barnard* (1984), 104 Ill. 2d 218, 230; *Frank*, 48 Ill. 2d at 505.

The record reveals the following. In addition to at-

torney Wayne McFarland, attorney John Hanson was appointed to assist in the defense at McFarland's request. Pursuant to discovery, trial counsel advised the State that defendant might assert the affirmative defenses of insanity and intoxication. During *voir dire*, trial counsel polled venire members regarding insanity and intoxication defenses. Almost invariably, trial counsel merely advised them that there *might be* evidence of an insanity and intoxication defense introduced during the trial. By comparison, venire members were also told that there was the possibility of the imposition of the death penalty in the case.

During opening statement, trial counsel argued that: the State's case was circumstantial; the credibility of the defendant's statements was at issue; he was not the only person who drove in a car from the area where the victim was discovered missing; other persons who had done so were later observed in the location where defendant was arrested during the early morning; the State's forensic evidence was inconclusive; a note found in the pocket of a shirt belonging to defendant found in the Mazon River bore handwriting other than the defendant's; and hydrology evidence would be presented showing that the shirt was discoverable on the day that the victim's body was found, rather than two days later.

Trial counsel also advised the jury that no matter what was proved or disproved, defendant "very simply lacked the requisite mental capacities for you to find him guilty of any of the crimes" because his ability to act in a knowing or intentional fashion had been completely removed by alcohol and he had a mental disease or defect that made it impossible for him to conform his conduct to requirements of law.

During the State's case in chief, a deposition transcript of Esther Harmon was introduced. Harmon testified that defendant had appeared to her to be in another

world on the evening that the victim was discovered missing. Harmon also denied this statement. Examination of a police officer witness additionally suggested defendant's mental state at the time of the crime.

Following several adverse rulings relating to the insanity evidence and the State's tender of 500 to 600 pages of previously undisclosed impeachment materials, trial counsel announced the withdrawal of the insanity defense and subsequently presented no insanity evidence. An intoxication defense was not advanced due to the possibility that defendant would be impeached with other-crimes evidence.

In our view, this record hardly demonstrates that two logically inconsistent defenses were "presented" by trial counsel. Neither is it demonstrated that trial counsel's opening statement implicitly conceded defendant's commission of the crime. First, we take issue with defendant's characterization of the manner in which the defenses were raised in the case. The *voir dire* questioning of the jurors merely posed certain possibilities that might occur at trial. Trial counsel's questioning of the jurors "conditioned" them to expect an insanity or intoxication defense no more than other questioning conditioned them to expect defendant's eligibility for the death penalty. Quite simply, *voir dire* is not argument or the presentation of evidence. Furthermore, trial counsel did not introduce evidence of both insanity or intoxication and reasonable doubt at trial. Notably, defendant's supporting materials seem to suggest otherwise.

Second, while the various affiants are correct that defenses of insanity and reasonable doubt are theoretically inconsistent, in Illinois practice, the defenses may be presented simultaneously and to do so does not violate the constitution. See *People v. Speck* (1968), 41 Ill. 2d 177; *People v. Ford* (1968), 39 Ill. 2d 318, 320-21;

*People v. Moore* (1986), 147 Ill. App. 3d 881, 885-86; *People v. Robinson* (1981), 102 Ill. App. 3d 884, 890.

Also, trial counsel's opening statement, rather than conceding defendant's commission of the criminal acts, appears calculated to leave the jury with the impression that whatever the evidence might show, defendant's mental state made it somehow impossible for him to commit the crime. Moreover, because there was no evidence of insanity and scant evidence of intoxication presented, the jury was never in the position where it had to actually resolve any inconsistencies between any insanity and reasonable doubt defenses. In sum, we do not agree with defendant's characterization that trial counsel "presented" two inconsistent defenses.

Defendant argued that in addition to presenting inconsistent defenses, trial counsel ultimately "abandoned" the viable insanity defense at trial and failed to present expert witness opinion, as he had promised the jury in opening statement. According to defendant, the failure to deliver the promised evidence prejudiced defendant because the jury could believe that impartial experts could not or would not testify on defendant's behalf, and the prosecution was able to refer repeatedly in closing argument to the failure to produce evidence of insanity. Defendant also claims that the withdrawal of the insanity defense resulted in undermining the intoxication defense because defendant could not testify and provide the best evidence of that defense.

A critical review of the following facts explains trial counsel's withdrawal of the insanity defense. Trial counsel indicated during discovery that they would call Dr. Marvin Ziporyn as an expert witness on the subject of defendant's sanity at the time of the offense. Ziporyn was prepared to testify that he had interviewed and evaluated defendant and reviewed his EEG and medical records from Forest Hospital and Elgin State Hospital.

Apparently, during the course of the interview, defendant made statements to Dr. Ziporyn that he had sexually assaulted young girls at knifepoint on several occasions. The records from Elgin State Hospital revealed that in 1975, defendant had voluntarily committed himself shortly after being charged with attempted rape and burglary. According to the records, defendant told staff members that he had sexually assaulted young girls at knifepoint. The records also indicated that defendant requested the staff to write a letter to the court explaining why he had attempted to commit the charged rape and that defendant was disappointed when this was not done, expressing that it was for that reason that he had committed himself.

At trial, following the close of the State's case in chief, the trial court heard argument on several motions *in limine* brought by trial counsel. The first motion *in limine* pertained to the anticipated testimony of defendant and requested a ruling that cross-examination be limited to areas explored on direct examination. Trial counsel represented that defendant was expected to testify about his relationship with William Starbuck and his wife, LeAllen Starbuck, and his interrogation by police. The trial court ultimately ruled that if defendant testified regarding his interrogation, the court would allow cross-examination regarding defendant's confessions. Following the ruling, trial counsel offered that defendant might testify about his state of mind in that the acts described in his statements appeared to him as though he was watching himself on television doing them. The State took the position that such testimony went beyond the subject of defendant's interrogation and into his mental capacities, thus involving the subject of his prior mental health history including his 1975 hospitalization at Elgin State Hospital.

Another motion sought clarification regarding the

scope of Dr. Ziporyn's testimony. The trial court ruled that if Dr. Ziporyn should testify that he based his opinion on the interview with defendant, the State could cross-examine Dr. Ziporyn regarding defendant's statements concerning the sexual assaults. The court apparently indicated also that if Dr. Ziporyn testified that he based his opinion also on his review of the hospital records, the State could cross-examine him regarding defendant's statements to those previous treaters. Also, the record reveals no indication that trial counsel was perturbed by this ruling or planned any change of strategy as a result of it.

By another motion *in limine*, the defense sought to exclude 500 to 600 pages of materials sought to be introduced by the State for impeachment of Dr. Ziporyn. The materials included an article by Dr. Ziporyn, parts of a book by Dr. Ziporyn on Richard Speck, transcripts of Dr. Ziporyn's testimony at other trials in other cases, and a transcript of defendant's testimony in the 1975 attempted rape case. The trial court stated that it would allow admission of the transcript of defendant's previous testimony to the extent that it was offered to show that he had claimed amnesia regarding the incident to a prior medical treater, but under oath he had recalled the incident and did not claim amnesia. These materials had not been previously disclosed to trial counsel, although some of the information may have been known. Trial counsel objected to the introduction of the materials, claiming a violation of discovery. Although the trial court acknowledged that the State ought to have disclosed the materials, the court ruled the materials could be introduced and allowed trial counsel a two-hour recess to review the materials with Dr. Ziporyn.

By yet another motion *in limine*, trial counsel next sought to preclude the State from questioning defendant regarding whether he killed the victim and committed

other unproven crimes in the form of the knife-wielding sexual assaults on young girls admitted to Dr. Ziporyn. The trial court precluded the State from cross-examining defendant regarding any unproven other crimes, including those related to Dr. Ziporyn. The trial court cautioned, however, that if defendant raised the issue of his state of mind on direct examination, as to either insanity or drugged condition, the State would be allowed to explore defendant's Elgin State Hospital hospitalization, including his 1975 symptoms, whether truthfully or untruthfully given.

In an attempt to preclude this possible line of questioning, trial counsel assured the court that defendant had decided on the previous day to withdraw Dr. Ziporyn and the insanity defense. Trial counsel argued that defendant's anticipated testimony would only respond to the State's evidence concerning the confessions by showing surrounding circumstances such as defendant's intoxication. Trial counsel allowed that the withdrawal of the insanity defense and Dr. Ziporyn was based on the court's previous rulings regarding the permissible scope of Dr. Ziporyn's cross-examination relating to the 1975 incident and comments contained in the medical reports.

During the discussion, the trial court indicated its belief that the issue of defendant's insanity had been raised by evidence such as Esther Harmon's testimony that defendant had appeared to her to have been in another world. Trial counsel argued that Harmon's observation, which Harmon later denied, merely went to the fact of defendant's intoxication. Trial counsel argued that if the insanity defense was stated to be withdrawn, and no evidence in support of it was offered, the State could claim no burden to show sanity by cross-examining defendant about his interview with Dr. Ziporyn or his hospitalizations.

Discussion between the parties and the court continued, centering around the issue of whether defendant's anticipated testimony about the circumstances of his confessions opened the door to cross-examination regarding the sexual assaults admitted to Dr. Ziporyn. Finally, the trial court held that if defendant testified, he ran the strong risk of being cross-examined regarding the sexual assaults he had reported to Dr. Ziporyn.

Trial counsel later moved for leave to make an offer of proof. Trial counsel wished to demonstrate that defendant could be queried on direct examination about the interrogation process without opening the door to the subject of his sanity. The trial court denied the motion. A strategic decision was then made by trial counsel that defendant would not testify because the possible scope of cross-examination was indeterminate and apparently exposed defendant to risk of impeachment with evidence of other crimes.

Despite defendant's assertions to the contrary, the insanity defense was infirm from the very beginning of trial. The presentation of an insanity defense necessarily risks the introduction into evidence of other crimes related by an accuser to a treater. (See *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 424-25.) Other-crimes evidence in the context of an insanity defense tends towards proof of state of mind as well as it tends towards prejudice. In this respect, the anticipated presentation of the insanity defense here was no different. Defendant had made statements to Dr. Ziporyn and staff at Elgin State Hospital regarding other crimes which trial counsel was apparently prepared to risk introducing. In this case, defendant's records also contained indications that he had been motivated once to seek psychological evaluation and treatment in order to create a possible defense to charges of attempted rape and burglary. This information had the tendency to completely destroy

defendant's credibility in asserting the insanity defense here.

While trial counsel had the Elgin State Hospital records which contained this information, the record suggests that counsel did not appreciate the ramifications of the evidence at the beginning of the case and even after the trial court ruled concerning the permissible scope of Dr. Ziporyn's cross-examination. It was not until apparently trial counsel reviewed the State's impeachment materials that counsel realized that the State meant to attack defendant's assertion of the insanity defense, itself. Trial counsel apparently failed to appreciate the damage potential of this evidence before trial and made an error of judgment in raising the insanity defense.

While trial counsel erred initially by failing to anticipate the value of certain evidence in preparing the case, that error in itself was not incompetence. Incompetence is not established by errors or unsuccessful strategic judgments. (*People v. Kubat* (1983), 94 Ill. 2d 437, 486.) From the beginning of trial, trial counsel relied, primarily, on the theory that defendant was innocent. In opening statement and throughout cross-examination in the State's case in chief, trial counsel emphasized the insufficiency of the State's evidence and elicited evidence in support of reasonable doubt. Furthermore, once trial counsel realized the direction the case was taking upon the disclosure of the State's impeachment materials, counsel made a "seat-of-the-pants" strategic decision to abandon the insanity defense. (See *People v. Harris* (1989), 129 Ill. 2d 123, 156.) In assessing *Strickland*'s performance component, a court must indulge in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and not view restrictively the wide latitude counsel has in making tactical decisions. (See *Barnard*, 104 Ill. 2d at

233.) Trial counsel's overall performance in these circumstances does not demonstrate incompetence. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable ***." (*Strickland*, 466 U.S. at 690, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Trial counsel's decision to withdraw the insanity defense was a reasonable and necessary tactical decision.

Moreover, even if trial counsel had not posited an insanity defense, the most that can be said is that defendant would have testified that he was so intoxicated at the time of the crime that he lacked the requisite intent and that his confessions were involuntary. In light of the unaffected and overwhelming evidence to the contrary, *i.e.*, defendant drove 31 miles from victim's home, was not observed to be drunk or highly intoxicated by any witnesses, initially denied killing the victim to police, made eight statements to police admitting that he killed the victim, and signed his written confessions, it is not reasonably probable that defendant's testimony would have produced a different result here.

Defendant additionally argued that trial counsel failed to adequately preserve a record of error related to the abandonment of the insanity defense. On direct appeal of defendant's conviction and death sentence, this court found that an alleged error concerning the permissible scope of certain cross-examination was not preserved for review because trial counsel did not choose to stand on their objections and call the witnesses. (See *Whitehead*, 116 Ill. 2d at 442-44.) The witnesses were Dr. Ziporyn, who would have testified in support of the insanity defense, and defendant, who would have testified in support of the intoxication and reasonable doubt defenses. Defendant claims that trial counsel should have either called these witnesses to the stand to incur the possible prejudice created by the trial court's

adverse rulings or made an acceptable offer of proof. However, the record notably reflects that trial counsel, in fact, did attempt to make an offer of proof or other motion to enable the trial court to decide the appropriate scope of his testimony. See *Whitehead*, 116 Ill. 2d at 443.

Defendant also argued trial counsel's claimed failure to object to improper comments by the prosecution. According to defendant, trial counsel did not object when the prosecution impermissibly highlighted his failure to testify, made an issue of trial counsel's sincerity, misled the jury by suggesting that defendant's theories of intoxication and reasonable doubt were sufficient in law only if the jury believed both defenses, and referred to him as a "pervert." These alleged errors were raised on direct appeal as instances of prosecutorial misconduct which denied defendant a fair trial. See *Whitehead*, 116 Ill. 2d at 445-47 (holding claimed errors waived for failure to timely object).

We cannot say, however, even assuming defense counsel's lack of competence with respect to these two latter arguments, that the result at trial would have been any different. Even if the insanity defense had never been posited and dropped, and trial counsel had timely objected to the alleged improper prosecutorial comments, there is not a reasonable probability that, given the State's evidence, the outcome would have been different here. Appellate counsel's appraisal of the merits of these claims was not patently wrong. We hold that the trial court did not err in dismissing the claims of trial counsel's ineffectiveness in handling the defenses and failing to object to certain prosecutorial comments.

## B. Merits

According to defendant's second- and third-amended petitions, trial counsel failed to investigate, present and

argue evidence which was promised in support of the reasonable doubt defense. Defendant contends that trial counsel failed to vigorously pursue this defense even though they were aware of many facts and circumstances pointing to its viability. Defendant contends that trial counsel's failures constituted ineffective assistance. As stated previously, this claim was not barred by waiver, and we may consider its merits. See *People v. Owens* (1989), 129 Ill. 2d 303, 308-09 (considering merits of ineffective assistance claim on appeal of dismissal of petition); *People v. Hall* (1993), 157 Ill. 2d 324 (same).

Defendant contends that, even though trial counsel was aware of certain facts, trial counsel did not investigate and present evidence or "communicate" to the jury that William Starbuck or someone else committed the crime. Defendant contends that where useful "facts and/or circumstances presented themselves, trial counsel refused to utilize them in terms of constructing the reasonable doubt defense, and unreasonably ignored opportunities to weave the facts together into that defense."

According to defendant, trial counsel was aware before trial that defendant and LeAllen Starbuck had been involved in a sexual relationship prior to August 9, 1982, and that LeAllen had told defendant that she was pregnant with his child. Defendant points to other facts introduced into evidence and also known to trial counsel that concerned LeAllen's husband, William Starbuck (he suspected LeAllen of adultery, he followed her around, and he initially lied to police concerning his whereabouts around the time of the victim's disappearance). Defendant argues that trial counsel should have brought out on cross-examination of LeAllen that she and defendant had a relationship and thereby raised the inference that William had a motive to frame defendant for the murder of the victim. Trial counsel should

also have "highlight[ed]" the testimony of William before the jury with regard to the relationship between defendant and LeAllen.

Defendant also points to other facts known to trial counsel and in evidence that he asserts made it more likely that William killed the victim, rather than defendant (William and defendant together drinking beer all day prior to victim's disappearance, William, as a resident of their household, having possible access to Harmon's car keys and defendant's shirt, and William, like defendant, leaving the area from where the victim disappeared around that same time). According to defendant, trial counsel should have pressed the point in cross-examination of William Starbuck, on direct examination of the victim's brother, or in opening and closing that William, with motive to frame defendant, was one of the last persons in the area where the victim was playing prior to her disappearance.

Defendant also apparently claims that trial counsel should have either elicited evidence or argued that William, as a resident of defendant's household, had access to the shirt belonging to defendant which was found in the Mazon River and Harmon's car keys, which gave William the opportunity to plant evidence in the car.

Defendant additionally claims that trial counsel: failed to effectively cross-examine the coroner and argue the inconsistencies between his statements and the autopsy reports; failed to present evidence that his confessions were involuntary; failed to investigate the identity of handwriting found on a note in the pocket of a shirt belonging to defendant found in the Mazon River; and failed to present hydrology evidence promised to the jury in opening argument.

The ever-present duty of independent investigation in a criminal defense effort is to be judged using a standard of reasonableness in light of all circumstances pre-

sented. Reasonableness is to be determined by considering the informed strategic choices of, as well as the information supplied by, the defendant. *Erickson*, 161 Ill. 2d at 90.

The record shows that trial counsel presented a plethora of well-argued motions in attempts to exclude or limit the State's evidence. The record reveals vigorous cross-examination by trial counsel and numerous objections. Throughout the course of the State's case in chief, trial counsel's primary strategy was to elicit evidence and raise inferences supporting a theory of innocence. Many of defendant's arguments essentially concern trial counsel's ability to "communicate," "highlight," or "weave" evidence already introduced into the case.

We also note the record shows that trial counsel's cross-examination of the coroner addressed various inconsistencies, and that Robert H. Kirschner, a forensic pathologist and deputy medical examiner, testified for the defense concerning the inconsistencies. Kirschner reviewed the autopsy report, but disagreed with the coroner that the child victim had conclusively suffered anal penetration and that the cause of death was conclusively drowning. In Kirschner's opinion, it was possible that death was caused by an injury to the head and that the victim was killed elsewhere, transported dead and then dumped in the Mazon River. Kirschner testified that there were inconsistencies between defendant's statements to police and the autopsy protocol prepared by the coroner.

The record additionally shows that trial counsel did indeed investigate the identity of the handwriting found on the note, but that no person at the written address could be located; and that trial counsel engaged the services of a hydrologist who reviewed the evidence, and made tests, but the tests were inconclusive. Notably,

also, the only evidence which defendant can point to in support of the involuntariness of his confessions is his own testimony. Also, without additional evidence to which defendant is able to point, William's residence with defendant does not show his access to defendant's shirt or the keys to Harmon's car.

In the final analysis, however, counsel's effectiveness in this area may be judged by the prejudice component of *Strickland*, whether there is a reasonable probability that the result would have been different. As stated previously, an assessment of the prejudice component of the *Strickland* test involves looking at the findings unaffected by error, accounting for the effect of error on remaining findings, and answering, in the end, whether the decision would reasonably likely have been different. *Erickson*, 161 Ill. 2d at 90.

The unaffected findings show that defendant was witnessed observing Vickie Wrobel, her brother, and a playmate as they were playing shortly before she disappeared. While the children were playing, defendant stood and walked in a nearby driveway area. Defendant had consumed many beers that day, but did not appear drunk at the time he was watching the children. When observed by one of the children at that time, defendant was wearing a short-sleeved maroon shirt. Within minutes of the victim's disappearance, defendant and an automobile that defendant sometimes drove, which had been parked in the driveway, were also gone. Defendant did not have the owner's permission to take the car. Hours later, defendant arrived in that auto at his sister's trailer home, some 31 miles from the Wrobel residence. At the time he arrived, defendant was not wearing a shirt and his boots were wet. When police initially arrived at the trailer, no adults except defendant and his brother-in-law were present. Defendant drank a beer, but did not appear to be drunk, according

to witnesses. Shortly after their arrival, police checked inside the auto and discovered the victim's damp panties and shorts on the front passenger's side seat.

On the following morning, the victim's body was discovered in the nearby Mazon River. Defendant confessed to police that he had killed her. Defendant provided information which was later corroborated by the victim's condition and injuries, including that her vagina was penetrated with a finger, she was strangled with a cloth, and she had consumed beer shortly before her death. Defendant provided the police with eight statements, some of which were either written and signed by him or tape recorded. Throughout the entirety of the statements, defendant admitted killing the child. Defendant also stated that he had taken off his clothes and left his shirt at the river.

Police later found damp vegetation on the front floor mats of the auto, and a substance on the interior panel of the front passenger side door which was consistent with a fruit drink that the victim had been drinking right before her disappearance. Two days after the discovery of the victim's body, a maroon shirt was found in the Mazon River, near the place where the body was found. The shirt belonged to defendant, and had a note with his handwriting on it inside the pocket. The shirt was identified by the victim's brother as the shirt defendant was wearing when he was looking at the victim shortly before she disappeared.

Even if trial counsel had introduced evidence that LeAllen was pregnant with defendant's child and emphasized all of the facts that had been introduced into evidence concerning William's relationship with his wife, his departure from the area where the victim was last observed playing, his presence at the trailer where defendant was later arrested, and his shared residence with defendant, it is not reasonably likely that the result

in this case would have been different. What is offered by defendant pales beside the overwhelming evidence of guilt based on findings unaffected by error. Our review of this record convinces us that confidence in the outcome is not undermined even assuming the claimed errors. We conclude that trial counsel was not ineffective in investigating, presenting and arguing evidence in support of reasonable doubt.

Defendant also contended in his petitions that the performance of trial counsel at sentencing fell below the standards of an experienced and reasonable attorney in a capital case.

The record indicates that trial counsel had never previously represented an accused in a capital case. Arguing that inexperience, trial counsel requested the appointment by the trial court of expert assistance to investigate and prepare mitigation factors for presentation at sentencing. Trial counsel desired the assistance of an expert in the nature of a social psychologist or social worker trained in gathering mitigation evidence. The trial court denied the request, finding that the assistance trial counsel sought was no more than that which should be performed by an attorney. The trial court noted that an investigator had already been assigned to the case and any necessary investigation of mitigation evidence could be conducted by him. Defendant complains that the assigned investigator had no ability in gathering mitigation evidence, and as a result of the ruling, he was not provided capable assistance to develop mitigation evidence. Defendant also complains that trial counsel advised him that it would be best to call as few witnesses as possible to avoid adverse cross-examination.

In the context of a death sentencing hearing, a defendant must prove that there is a reasonable probability that, absent counsel's deficient conduct, the sen-

tencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Mahaffey*, 165 Ill. 2d at 466.

Evidence introduced at sentencing showed that defendant had a history of sexually abusing young girls, including at least one of his sisters. Defendant's sister testified in aggravation, and several young girls also testified describing the sexual abuse committed by defendant. Prior convictions included the arson and burglary of a fully occupied motel. When still a minor, defendant had also been adjudicated delinquent on charges of burglary.

Trial counsel called three witnesses: defendant, his wife, and Dr. Ziporyn. Defendant testified that his family had been poor, his mother and father had physically abused him, and there was a history of mental illness in his mother's family. Defendant also admitted that he had sexually assaulted his sister, but said that it was not committed in the manner she had described. Defendant offered a defense of insanity in mitigation of his conduct. He testified that he had experienced a feverish feeling for about a week preceding the attack on the victim, and that he was unable to remember committing the crime.

Dr. Ziporyn testified that defendant suffered from an organic brain syndrome at the time of the crime which resulted in his experiencing impulse control problems. According to Dr. Ziporyn, defendant had central nervous system pathology and presented a clinical picture of brain damage. In Dr. Ziporyn's opinion, defendant could not conform his conduct to requirements of law. Defendant's wife testified that he behaved differently when he was drunk, and that he had previously complained of blackouts and fever.

Dr. Werner Tuteur, the State's rebuttal witness and a psychiatrist, testified that defendant suffered from no

mental or emotional disturbance at the time of the murder. Dr. Tuteur diagnosed defendant as afflicted with pedophilia and alcohol abuse.

Defendant claims that the following additional evidence should have been introduced at his sentencing and would have militated against the death penalty. By affidavit, Dr. Linda Wetzel stated that it was likely that defendant was afflicted with Episodic Dyscontrol associated with a partial complex seizure disorder. Dr. Wetzel's affidavit described this brain syndrome as "an abrupt single act or short series of acts with a common intention carried through to completion with at least a partial release of tension or gratification of a special need." The syndrome also was described as having "the characteristic of a maladaptive, precipitous interruption in the life-style or the life-flow of the individual."

Dr. Michael Levins stated that defendant's dysfunctional background created a psychological condition of pedophilia which diminished his capacity for self-control and his ability to distinguish right from wrong; that the condition worsened with alcohol consumption, but was treatable; and that defendant experienced guilt, but would not be dangerous while incarcerated. Dr. Levins also found that defendant possibly suffered from an organic brain impairment.

Cynthia Hines stated that she investigated defendant's family. Hines essentially reported that: defendant's mother was a severe and chronic alcoholic; several of defendant's siblings were alcoholics; he was an alcoholic and experienced blackouts; his parents were physically and emotionally abusive; and there was a pattern of incest in the family.

While Dr. Wetzel and Dr. Levins gave name and refined description to defendant's organic and psychologic disorders which Dr. Ziporyn had in part diagnosed, Hines merely provided more details about the known

facts of defendant's family background, *i.e.*, impoverished, abusive, alcoholic, incestuous. Essentially, this additional evidence was only cumulative and it must be balanced against aggravating evidence that was considerable. Defendant's own lengthy testimony at sentencing bespoke a lack of contrition or remorse. We find that there does not exist a reasonable probability that had this additional evidence been introduced at sentencing defendant would have been spared the death penalty. Trial counsel was not ineffective for being unable or failing to investigate and present this evidence in mitigation at sentencing.

In sum, defendant's claim of ineffective assistance of trial counsel is unproven. The dismissal of the second-amended petition was proper, as was the dismissal of this claim in the third-amended petition.

## II.

### Right To Impartial Jury

In the third-amended petition, defendant claimed a violation of the sixth amendment right to an impartial jury. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8.) Defendant claimed violation because: (1) the jurors had become aware soon after their selection that their names and addresses had been published in the local newspaper, and they were upset, and (2) the jurors had observed an outburst directed against defendant by the mother of the victim while she was on the witness stand during a sidebar.

In support of the claim, defendant included the affidavits of two jurors, Charlene Joneson and Glenn Friant, Rose Marie Bell, the clerk of the circuit court, and Linda Meza, a social psychologist. Each affiant attested to facts which clearly did not exist within the record on direct appeal. We find that the claim was not waived and the trial court erred by dismissing it. Remand for

an evidentiary hearing is unnecessary, however, because defendant has not demonstrated a substantial violation of constitutional rights. See *Silagy,* 116 Ill. 2d at 365.

Defendant alleged that by publication of the jurors' names in the Morris Daily Herald, the local newspaper, the "protective shield" which is intended to surround a jury was removed, which allowed them to be influenced by improper outside factors. (See *People v. Gale* (1971), 132 Ill. App. 2d 986.) Defendant claims that with publication of their names, jurors acquired the incentive to convict defendant because of their fear of him and their desire to conform to prevailing community pressures.

Joneson stated in her affidavit that jurors were displeased about publication of their names and two complained to the clerk because "[a] person who might be a murderer would have their names and addresses if he were set free." Bell stated that the jury had contacted her as the clerk of the court and complained that their names and addresses had appeared in the local newspaper. Meza stated that with publication of the jurors' names, their privacy and anonymity, which ensures a neutral vote concerning guilt or innocence, was lost.

Friant stated that while he was in the courtroom, he observed the victim's mother arise and shout and cry towards defendant. The record bears out Friant's statement. The record reveals that after the attorneys and the court returned to the courtroom from a conference, and while the victim's mother was still seated on the witness stand, the court admonished the jury to disregard any comments that could have been made by the witness. Defendant claims the outburst from a family-of-the-victim witness seated on the stand inflamed the jury's sympathies. Defendant maintains the trial court's admonishment was insufficient to undo any damage that was thereby caused.

The vital question to be determined is whether the

jurors had been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial. (See *People v. Hryciuk* (1954), 5 Ill. 2d 176, 183.) This determination involves the court's consideration of all the facts and circumstances and conjecture regarding the effect that the incompetent information had upon the minds of the jurors, a determination incapable of absolute accuracy or a very high degree of reliability. Jurors themselves are incapable even of knowing the effect which prejudicial matters have upon their minds. The determination, therefore, must rest in sound judicial discretion to reach an inference, from the facts and circumstances, that a fair trial had or had not been interfered with. The most controlling fact or circumstance to create the inference is the character and nature of the allegedly prejudicial information. Each case must be determined upon its own facts and circumstances. See *Hryciuk*, 5 Ill. 2d at 183-85.

Also, it is accepted that a genuine emotional outburst by a witness does not require a mistrial. (See *People v. Howard* (1991), 147 Ill. 2d 103; *People v. Hudson* (1970), 46 Ill. 2d 177; *People v. Bradley* (1976), 43 Ill. App. 3d 463.) It has even been held that a trial court's decision not to caution the jury against being influenced by a witness' weeping did not constitute prejudice to the defendant. *People v. Hairston* (1973), 10 Ill. App. 3d 678, 686.

Information that a juror's name and address has been published in a local newspaper during the course of a murder trial held in a small metropolitan area is bound to have impact. With that information, as evidenced by Joneson's affidavit, jurors become aware that they are publicly exposed. We cannot infer, however, on this basis that an honest juror would therefore give sway to his emotions and disregard the fundamental requirement of a fair trial and decide to convict a person in or-

der to be absolutely secure. Neither can we find that the emotional outburst here resulted in prejudice. The incident was apparently brief, it was isolated, there was no attempt to obtain the jury's sympathy as a result of it, the court admonished the jury, and there is no indication in the record that it would have been unable to heed the admonition and disregard the incident during its deliberations. Simply put, mere speculation concerning prejudice to the defendant is not sufficient to warrant reversal. *Cf. People v. Porter* (1986), 111 Ill. 2d 386, 405 (mere suspicion of bias or prejudice is not sufficient).

Defendant's supporting materials do not show that the jury was prejudiced. Defendant's right to an impartial jury was not violated. Dismissal of this claim from the third-amended petition was not error.

## III.

### Due Process Violation

Defendant next claims that he was denied due process of law (U.S. Const., amend. XIV) because one of the jurors later stated that he had assessed defendant's guilt or innocence on the basis of a concept defendant charges was antithetical to the presumption of innocence and burden of proof. Defendant contends that the trial court erred in dismissing this claim in the third-amended petition on the basis of waiver. Defendant correctly points out that the claim was supported by facts not of record on direct appeal.

Defendant included the affidavit of Glenn Friant, a juror, with the third-amended petition. Friant stated that at the beginning of trial, he resolved to weigh the evidence, whether for or against defendant, fairly. To evaluate defendant's guilt or innocence, Friant stated that he conceptualized a line scale, ranging from 1 to 10, with 10 representing unequivocal guilt and 1 representing unequivocal innocence. Before any evi-

dence was presented, Friant considered that defendant's "position" was at 5. Friant changed defendant's "position" on the scale as evidence was introduced. At the end of trial, defendant was described by Friant as positioned at 10 on the scale.

Essential to the qualifications of jurors in criminal cases is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proven guilty beyond reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. (See *People v. Zehr* (1984), 103 Ill. 2d 472, 477.) The record reflects that the jury was qualified during *voir dire* with questioning concerning these guarantees. It is to be presumed that an honest juror would understand and heed these directives as the evidence is presented. The record shows also that the jury was instructed at the close of the evidence regarding the State's burden of proof and the presumption of innocence. Defendant has not shown that Friant ignored these directives or instructions.

In our view, Friant's scaling is shown to be no more than a method to evaluate and weigh the evidence as it was introduced. According to Friant's scale, even if no evidence supporting innocence was introduced, "defendant's position" on the scale would not be at unequivocal guilt unless the State satisfied a clear burden of proof. Thus, Friant would not have considered defendant proven guilty beyond reasonable doubt unless the weight of the evidence had reached the position of a full 10 on the scale. Obviously also, under Friant's scale, while the introduction of evidence supporting innocence might detract from evidence supporting guilt, that evidence could not have the effect of making defendant any *more* innocent than he was when "his" position was at 5. One cannot be a bit guilty or a bit innocent. Despite the reference to defendant's "position" on the scale, Fri-

ant's scale apparently weighed the body of evidence in terms of its value as each new piece of evidence was introduced and not defendant's guilt or innocence.

Accordingly, we conclude defendant's right to fourteenth amendment due process was not violated. Dismissal of this claim from the third-amended petition was not in error.

## IV.

### Constitutionality of Death Penalty

In his second-amended petition, defendant challenged the constitutionality of the Illinois death penalty statute. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b).) Among other reasons, defendant alleged the statute was unconstitutional by not including adequate guidelines to direct prosecutors in seeking imposition of the death penalty. As support for this argument, defendant cited *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246, which has now been overturned. (See *Silagy v. Peters* (7th Cir. 1990), 905 F.2d 986, 990-94.) This challenge was raised also by defendant on direct appeal and may not be again considered under the bar of *res judicata*. See *Whitehead*, 116 Ill. 2d at 465.

## V.

### Denial of Motion for Reconsideration

Lastly, petitioner contends that the trial court erred in denying the motion for reconsideration filed after the dismissal of his second-amended petition. Defendant requested the allowance of an opportunity to utilize the resources of the Capital Resource Center to amend his petition. This issue is moot due to the fact that defendant was able, in fact, to utilize those resources to support and draft his third-amended petition.

## CONCLUSION

Based on the foregoing, we affirm the trial court's dismissal of the second-amended petition and addition, the dismissal of certain claims included in the third-amended petition and the denial of the third-amended petition.

For the reasons stated, the judgment of the circuit court of Grundy County dismissing or denying each of defendant's post-conviction claims is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 14, 1996, as the date on which the sentence of death entered in the circuit court of Grundy County is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE MILLER, specially concurring:

I concur in the judgment of the court. Unlike the majority, however, I would hold that the defendant's third-amended post-conviction petition was a repetitive filing and warrants dismissal on that ground alone.

As the majority opinion recounts, the circuit court dismissed the defendant's second-amended post-conviction petition and later denied the defendant's motion for reconsideration, in which the defendant sought, among other things, leave to supplement the second-amended petition. The defendant then filed a notice of appeal from those rulings. About seven months later, while the appeal was pending, the defendant filed a

third-amended post-conviction petition. Besides repeating a number of old claims, the third-amended petition raised new challenges to the performance of trial counsel and to the impartiality of the jury used at trial.

If the procedural history recited by the majority demonstrates anything, it is that the defendant's third-amended post-conviction petition was a repetitive filing and is barred from consideration by the rule that severely limits the submission of successive post-conviction petitions. Section 122—3 of the Post-Conviction Hearing Act provides, "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." (725 ILCS 5/122—3 (West 1994).) This court has consistently held that a defendant may file successive petitions only in exceptional circumstances, as when the original proceedings were deficient in some fundamental way and the defendant can demonstrate both cause for his failure to present his claims in a timely manner and prejudice from the procedural default. (*People v. Flores* (1992), 153 Ill. 2d 264, 273-80; *People v. Free* (1988), 122 Ill. 2d 367, 376-78.) The reasons marshalled by the majority in support of its consideration of the defendant's third-amended post-conviction petition are unpersuasive.

The majority opinion first mentions that the post-conviction judge apparently did not regard the third-amended petition as a successive filing; the majority notes that the judge, in disposing of the third-amended petition, ruled on issues he had previously decided and declined to reject other contentions as waived, even though the argument was then made that these claims were being presented in a successive filing. 169 Ill. 2d at 368-69.

I do not see how the post-conviction court's rationale for disposing of the defendant's third-amended petition prevents this court from determining whether or not

the defendant could file that petition in the first place. The post-conviction judge's reasons for dismissing the petition are not binding on this court, which may affirm the judgment below on any ground supported by the record (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387); after all, "the question before a reviewing court is the correctness of the result reached by the trial court, and not the correctness of the reasoning upon which that result was reached" (*People v. York* (1963), 29 Ill. 2d 68, 71). That the post-conviction judge failed to recognize the defendant's third-amended petition as an invalid successive filing does not mean that this court must now follow the same course.

The majority also notes that the defendant's appeal from the dismissal of his second-amended petition lay dormant in this court for several years while the third-amended petition was being litigated in the circuit court. (169 Ill. 2d at 369.) The majority apparently believes that as long as a reviewing court has not yet disposed of one post-conviction petition, a defendant is free to file additional petitions. No authority is offered in support of this remarkable proposition, which squarely conflicts with the considerations of finality that underlie the statutory bar to successive post-conviction petitions. The operation of that prohibition should not depend on the progress of the defendant's initial petition through the channels of appellate review.

Notably, the majority does not attempt to fit this case within the limited range of exceptions to the rule disallowing successive post-conviction petitions. The majority fails to explain in what way the original proceedings were deficient or fundamentally unfair. (See *Free*, 122 Ill. 2d at 376.) Nor does the case involve the presentation of a new, previously unavailable claim of ineffective assistance of counsel on direct appeal, an issue that this court has said may be presented in a successive pe-

tition. (See *Flores*, 153 Ill. 2d at 280.) The majority insists that the circumstances in this case are unusual, but I believe that the only thing unusual about the case is the majority's failure to enforce the customary bar against successive post-conviction petitions.