(No. 89141.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. LATASHA PULLIAM, Appellant.

*Opinion filed October 18, 2002.*

RARICK, J., took no part.
KILBRIDE, J., concurring in part and dissenting in part.

Marshall J. Hartman, Deputy Defender, and Anna Ahronheim, Assistant Deputy Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William B. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE THOMAS delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Latasha Pulliam, was convicted of murder, two counts of aggravated criminal sexual assault, and two counts of aggravated kidnapping, in connection with the sexual assault and death of a six-year-old girl. After a bifurcated sentencing hearing, the same jury found that defendant was death-eligible and that

there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial court sentenced defendant to death for the murder conviction and to three consecutive prison terms of 60, 30, and 15 years for the remaining convictions. On direct appeal, this court affirmed defendant's convictions and sentences. *People v. Pulliam*, 176 Ill. 2d 261 (1997). The United States Supreme Court subsequently denied defendant's petition for a writ of *certiorari*. *Pulliam v. Illinois*, 522 U.S. 921, 139 L. Ed. 2d 243, 118 S. Ct. 314 (1997).

Defendant then filed a *pro se* petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1996)) and requested the appointment of counsel. After counsel was appointed, defendant filed an amended post-conviction petition, challenging her death sentence on a number of grounds. The circuit court dismissed defendant's amended post-conviction petition without an evidentiary hearing. Defendant's appeal to this court ensued. See 134 Ill. 2d R. 651(a). For the reasons that follow, we affirm in part and reverse in part the judgment of the circuit court, and remand the cause to that court for an evidentiary hearing in light of the recent United States Supreme Court decision in *Atkins v. Virginia*, 536 U.S. 304, 153 L. Ed. 2d 335, 122 S. Ct. 2242 (2002), to determine whether defendant is mentally retarded and therefore, under *Atkins*, may not be executed.

## BACKGROUND

This court has previously set forth the evidence presented at defendant's trial in our opinion on direct appeal. *Pulliam*, 176 Ill. 2d 261. Therefore, we will discuss here only those facts necessary to resolve the issues involved in this appeal.

Defendant gave a signed, court-reported confession following her apprehension after the commission of the

crime. Defendant's statement revealed that, on March 21, 1991, defendant took six-year-old Shenosha Richards to defendant's apartment. There, defendant placed Shenosha in a bedroom with defendant's boyfriend and codefendant, Dwight Jordan. Defendant then went to the kitchen to use cocaine. When defendant returned to the bedroom, Shenosha was on the floor crying with her underwear down to her knees. Jordan was behind her attempting to attain an erection. Jordan then picked up a shoe polish bottle and inserted it into the victim's rectum. Defendant then placed the straight end of a hammer into Shenosha's vagina while Jordan continued inserting the shoe polish bottle into her rectum. Defendant and Jordan continued this assault for 10 minutes. Shenosha was crying, and when defendant put her hand over Shenosha's mouth, Shenosha attempted to scream. Defendant then took an electrical cord, wrapped it around Shenosha's neck, and began strangling her.

Defendant eventually took Shenosha to an empty apartment down the hall, where Shenosha told the defendant that she would not tell anyone, except she would have to tell her parents. At that point, defendant pulled the cord tighter around the victim's neck and continued tightening it for 10 minutes. Because defendant heard knocking at her apartment down the hall, she put Shenosha in a closet in the empty apartment. Defendant returned to the closet a few minutes later and noticed that Shenosha was no longer breathing. Defendant then hit Shenosha over the head with a hammer three or four times. After placing Shenosha in a garbage can, defendant struck the victim over the head with a two-by-four and then attempted to cover the victim's body with garbage.

The medical evidence revealed that in all Shenosha suffered 42 distinct injuries. She had two puncture wounds to her chest, which damaged her lungs and

coronary artery, and lacerations on her head, which penetrated to her skull. She also had numerous lacerations to her anus and vaginal area. Shenosha's injuries were consistent with the conduct described in defendant's confession.

After the State rested, defendant presented the testimony of Dr. Mark Moulthrop, a clinical psychologist. Moulthrop noted that he examined defendant in April 1994 and that he reviewed her educational records from her childhood. He testified about the results of the various psychological and IQ tests that were given to defendant through the years. A report of a psychological evaluation conducted by the board of education when defendant was five years old revealed that she was mentally impaired and that she was placed in special classes. Defendant was given the Wechsler Intelligence Scale for Children on three separate occasions as a child. That testing revealed that, when defendant was 11 years old, her verbal scale IQ was 72, her performance scale IQ was 77, and her full scale IQ was 72. At age 13, defendant had a verbal scale IQ of 72, a performance scale IQ of 86, and a full scale IQ of 77. Defendant was again administered the Wechsler Intelligence Scale for Children at age 15. At that time, her verbal scale IQ was 66, her performance scale IQ was 87, and her full scale IQ was 74. Moulthrop attributed the increase in defendant's IQ score after age 11 to "the practice effect," which means that she did better on the performance portion of the test because she had had the opportunity to take the same test more than once over the years. Dr. Moulthrop gave defendant the Wechsler Adult Intelligence Scale test during his April 1994 examination, revealing that her full scale IQ was 69. He concluded that defendant placed within the mildly mentally retarded range, which would be an IQ of 75 or below, or possibly 70 or below "depending on the system," down to an IQ of 55. Moulthrop then

explained the difficulties that a person in this range of mental capacity would have in life. Finally, Moulthrop noted that he did not believe defendant was "malingering" during his examination of her.

In rebuttal, the State presented the testimony of forensic psychologist Paul K. Fauteck. Dr. Fauteck was appointed by the court in 1991 to conduct a psychological examination of defendant. He testified that he believed defendant's full scale IQ was 74 and that she was not mildly mentally retarded. He said that the demarcation line for mild mental retardation was an IQ of under 70. He classified defendant as a "malingerer" because she faked mental illness and mental impairment during his examination of her. He further stated that he believed defendant likely malingered during the 1994 examination by Dr. Moulthrop.

Dr. Fauteck further testified that he based his assessment of defendant's IQ on her previous IQ tests and on some screening questions he asked her. He explained that he did not administer another IQ test to defendant because the previous ones were adequate and because it would be "frankly silly to administer an I.Q. test to someone that you know is malingering, that is not going to perform their best on the test." Fauteck defined a malingerer as someone who either pretends to have a mental disease or defect that they do not in fact have or exaggerates a mental disease or defect that they do have. Dr. Fauteck cited several examples from his observation of defendant during the examination to support his conclusion that defendant was malingering.

At the close of all the evidence, the jury found defendant guilty on the charges of first degree murder, aggravated criminal sexual assault, and aggravated kidnapping. At the conclusion of the first phase of a separate sentencing hearing, the same jury found defendant eligible for the death penalty based on the

statutory aggravating factors that the murder was committed during the course of aggravated criminal sexual assault and aggravated kidnapping (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)) and the victim was under the age of 12 and her death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(7)). The cause then proceeded to the hearing in aggravation and mitigation.

The State presented evidence in aggravation from several witnesses. Juilett Brown-Perry, a social worker employed by the Department of Children and Family Services (DCFS), testified that defendant was placed in state facilities when she was a youth, and she often ran away from them. On one occasion, defendant and another girl, who was also under the care of the state, ran away together. Defendant brought the girl to the residence of defendant's 27-year-old boyfriend. There, defendant physically forced the girl to have oral, anal, and vaginal sex with the 27-year-old man. The girl was also forced to perform oral sex on defendant.

Dreszina Jarrett testified that she was incarcerated with defendant at the Cook County jail in March 1991. During that time, defendant told Jarrett about the murder and sexual assault of Shenosha. Defendant also told Jarrett about the details of the crime, including that she used a wooden door stopper with a nail in it to jab Shenosha in the chest. According to Jarrett, defendant never shed any tears when telling about the crime.

Gloria LaFay Anderson, a Cook County sheriff's department officer, testified that in the mid-part of 1991 defendant sexually assaulted a female inmate. Defendant beat the woman and forced her to have oral sex. Anderson could not file a report about the incident because the victim was too scared to talk about it.

The State also presented evidence that defendant's baby daughter, Patrice, was twice hospitalized, once for

injuries consistent with physical abuse, and once for injuries consistent with both physical and sexual abuse. The first incident occurred on March 19, 1989, when defendant's daughter suffered second degree burns from having her buttocks dipped and scalded in hot water. The child was kept in the same diaper after the burn for over 16 hours, which would have been extremely painful and which caused the child to run a 105 degree fever. The child remained in the hospital burn unit for almost one month.

Defendant's daughter Patrice was again brought to the hospital on February 16, 1990. The examining physician observed numerous injuries on the child's body. She had a number of head injuries, including two black eyes and "a very well-defined linear-type of bruise with very sharp edges." The doctor noted the burn wound to the child's buttocks, but also noticed bruising to the buttocks that indicated a blow from an object. The child also had cigarette burns on her arms. Both of the child's thighs had multiple fingernail marks. Upon examination of the child's vaginal area, the doctor noted a fresh abrasion to the lip of the vagina and two fresh tears to the hymen. Defendant's explanations for the injuries were not consistent with the injuries themselves, and defendant had no explanation for the injuries to her daughter's vaginal area.

Dr. Fauteck testified on behalf of the State in aggravation that, based on both his examination of defendant on October 7, 1991, and his review of the facts of the case, it was his opinion that defendant did not suffer from a mental illness at the time the crimes were committed. Instead, he testified that defendant was a "sexual sadist," with borderline intellectual functioning and antisocial personality disorder. He described a sexual sadist as a person who sexually enjoys inflicting pain and suffering on another person. He noted that in its severe form it

tends to get worse over time and is "virtually untreatable."

In mitigation, Linda Sobotka, a sentencing advocate for the public defender's office, testified that she investigated and did a social history of defendant. Sobotka contacted defendant's parents and attempted to contact various relatives. She also spoke with DCFS workers and jail guards about defendant. She also reviewed numerous documents from DCFS, Hargrove Hospital, Cook County jail, and the Chicago board of education. Sobotka noted that defendant was born in 1971 to Joseph and Renee Pulliam, who were teenagers at the time. Defendant was born prematurely and spent the first two months of her life in an incubator. The family lived with Joseph's mother for the first three or four years before moving out on their own. The couple had a son, Joseph Jr., who reportedly died of sudden infant death syndrome (SIDS) as an infant.

Sobotka further testified that shortly after moving out of Joseph's parent's house and after Joseph Jr. died, Renee began drinking and became very violent in her disciplining of defendant. Because Joseph was mostly either working or attending school, Renee stayed home and raised defendant. When defendant went to kindergarten she was found to be educable but mentally handicapped. Around that same time, according to a report from the Chicago board of education (the board), defendant had many old scars, bruises, and lacerations on her face and arms. After testing at age seven, the board noted that defendant was in need of therapeutic intervention because of family problems.

Sobotka stated that around age 10 Renee began beating defendant "continuously" and was drinking more heavily. At that time, Joseph filed for divorce because he would come home from work and find Renee in the apartment with different men. When defendant was 12 years

old, her paternal grandmother, who seemed to be a positive influence, died. Defendant was also raped at age 12 by one of Renee's boyfriends. When Joseph found out about the incident, he took defendant to Wisconsin to live with him. A few months later, in August 1984, defendant was brought back to Chicago and admitted to Hargrove Hospital suffering from depression and "behavioral problems." Testing conducted at the hospital revealed that defendant was four or five grade levels behind in school. Defendant talked to the hospital staff about the abuse that she suffered at her mother's hands. She said that she felt responsible for the beatings and was concerned her mother would be caught. In 1986, at the age of 15, defendant was impregnated by one of Renee's boyfriends, who was 37 years old. When she was three months pregnant, defendant was again admitted to the hospital for depression.

Sobotka also testified that Joseph received guardianship of defendant's child, Antoinette, after she was born. Defendant, however, began living on the street, using cocaine and marijuana. Defendant eventually became pregnant again by another one of Renee's boyfriends. Patrice was born to defendant in 1988 and was addicted to cocaine. Eventually the child was taken away from defendant, and defendant moved in with Jordan, who was 47 years old at the time. Jordan physically abused defendant.

On cross-examination, the State questioned Sobotka about her knowledge of defendant's abuse of Patrice and her knowledge of the other aggravating evidence presented by the State. On redirect examination, Sobotka testified that there were numerous reports that Renee abused defendant. She noted that defendant had cuts, lacerations, and bruises on her body as a child, and once Renee put a hole in a wall by banging defendant's head into it. Sobotka further testified that in a presentence

investigation report, defendant indicated that defendant's mother began sexually abusing defendant at the age of five or six. Renee performed oral sex on defendant and had defendant perform oral sex on Renee. When Joseph went to work, Renee engaged in sex with various men and made defendant watch. On re-cross-examination, Sobotka acknowledged that defendant's allegations that she had been sexually abused by Renee were not made until after defendant was placed in custody for the crimes against Shenosha.

Dr. Jeffrey Teich, a psychiatrist, also testified on behalf of defendant in mitigation. Dr. Teich recounted defendant's social history and that defendant was abused as a child by her mother. He noted that defendant was raised without an effective support system in a violent and unpredictable home, where she was physically and sexually abused. He concluded that defendant was mildly mentally retarded and had an antisocial personality disorder. He explained the extent of defendant's mental capacity, including that defendant could understand concrete, but not abstract, concepts.

Additionally, three Cook County jail guards testified in mitigation about defendant's behavior while incarcerated. They noted that defendant was aggressive and physically dirty when she first entered the system, but her conduct and appearance changed over time. She became quieter and more friendly and polite toward other inmates and guards. She improved her personal hygiene as well.

Finally, the defense presented in mitigation the testimony of defendant's father, Joseph Pulliam. Joseph testified that Renee physically abused defendant when she was a child. Renee often kept defendant out of school because she did not want teachers to discover the injuries left by the abuse. He noted that the abuse began when defendant was five or six years old and that it continued

for the next 10 years. Joseph stated that his mother was a positive influence upon defendant, but Renee counteracted that influence. He acknowledged that Renee had always exerted more influence over defendant than he had.

At the close of the sentencing hearing, the jury unanimously found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial court sentenced defendant to death.

After the resolution of defendant's direct appeal and the denial of defendant's petition for writ of *certiorari* before the United State's Supreme Court, defendant filed an original and then an amended petition for post-conviction relief in the circuit court of Cook County. Defendant's amended petition for post-conviction relief raised seven claims, challenging only her sentence of death.

Defendant devoted the bulk of her amended petition for post-conviction relief to allegations that her trial counsel was ineffective at the aggravation-mitigation phase of the sentencing hearing because he failed to conduct a complete investigation into the mitigating evidence and then failed to present to the jury the evidence that would have been uncovered by a more thorough investigation. Defendant alleged, *inter alia*, that trial counsel was ineffective in the following ways: (1) he failed to obtain defendant's early childhood hospital records, which suggested defendant may have been sexually abused when she was 22 months old and that she may have suffered lead poisoning at age 2; (2) he failed to fully investigate the circumstances surrounding the death of defendant's brother, Joseph Jr., suggesting that the cause of the baby's death may have been due to abuse by Renee rather than SIDS; (3) he failed to present additional evidence that Renee sexually abused defendant to rebut any claim that defendant recently

fabricated her claim that Renee had sexually abused her; (4) he presented an inaccurate picture of defendant's early childhood by portraying Joseph as a responsible father when evidence existed that Joseph helped to conceal the abuse committed by Renee; (5) he failed to interview and present the testimony of numerous additional witnesses, including an expert witness, who could have provided information about defendant's abusive upbringing and the impact that it had on her; and (6) he failed to present evidence showing that defendant had organic brain damage.

Defendant's amended post-conviction petition includes a number of supporting affidavits and exhibits. In that regard, records from Michael Reese Hospital show that defendant was hospitalized when she was 22 months old with a 104 degree fever and that she had experienced a near-drowning incident in the bathtub. Defendant had various marks on her body indicative of physical abuse. She also had a perineal rash around her vagina. Renee and Joseph gave conflicting reports about the bathtub incident, and the parents were referred to social service for suspected child abuse. Defendant was eventually discharged to the care of her parents, but was to be "closely followed up by social service." Eight months later, defendant was again hospitalized—this time for ingesting iron pills. It was also noted that defendant had a high lead content in her blood. Hospital staff apparently did not consider whether defendant was an abused child at this time even though she had a rash on her face caused by "window sealer." Joseph informed the hospital that defendant's previous admission was due to a cold and fever.

Defendant attached the affidavit of Donna Crowell Bryant to her post-conviction petition. In her affidavit, Bryant stated that she was not contacted by trial counsel, but if she had been, she would have been willing to testify

that she had a seven-year relationship with Joseph that began in 1982. According to Bryant, defendant was repeatedly abused both physically and sexually by Renee. Joseph admitted to Bryant that Renee tried to drown defendant in the bathtub on one occasion, which resulted in defendant being taken to the hospital. Bryant also stated that Joseph told her that Joseph Jr. actually died from Renee suffocating the child and not from SIDS. When defendant was five years old, Renee had defendant performing and receiving oral sex. Joseph and his mother knew about the abuse, but they ignored it and covered it up.

Another affidavit attached to defendant's petition was that of Juliett Brown Perry, the DCFS social worker who testified on behalf of the State at defendant's sentencing hearing. Perry noted that she became defendant's caseworker when defendant was about 12 years old. According to Perry, defendant told her that Renee, Renee's boyfriend, and defendant all slept in the same bed together and had sex. Perry further noted that Renee was an alcoholic, and Joseph was always working. Perry stated that she would have been willing to testify about these matters, but she was not contacted by trial counsel for the defense.

Defendant further attached a letter of Janice J. Ophoven, M.D., a psychological expert, who reviewed the various documents in the case, including the Michael Reese Hospital records. Based on her review, Dr. Ophoven concluded that defendant was clearly the victim of repeated and severe physical and sexual abuse. Among the factors Ophoven relied upon to form her conclusion that defendant was sexually abused was the perineal rash noted when defendant was 22 months old and the sexually transmitted disease and pregnancy at ages 13 and 15. She opined that this type of abuse leads to tragic and long-term consequences for children and is a well

recognized and direct factor leading to abusive behavior as an adult. Ophoven further noted that Joseph Jr.'s death was highly suspicious and "there [was] insufficient evidence to exclude homicide."

Defendant also includes the 1979 report of Dr. Christel Lembke, who conducted a psychiatric examination of defendant at the request of the board of education. Lembke noted in the 1979 report that defendant "suffered early medical complications and [it] must [be] assume[d] that she has a considerable amount of brain damage."

Additionally, defendant included with her post-conviction petition the letters of Drs. Mark Moulthrop and Jonathan L. Hess. Dr. Moulthrop stated that based on a review of information not available to him at trial, he concluded that defendant had the following risk factors for brain damage in early childhood: maternal alcoholism during pregnancy, premature birth, febrile seizures and anoxia due to submersion in the bathtub, ingestion of iron and lead, blows to the head, and illicit drug use. Dr. Hess concluded in his letter that, based on his review of defendant's records, defendant has "verifiable brain dysfunction," which affects her ability to control her behavior.

Finally, defendant presented the affidavit of Gary Copp. Copp stated in his affidavit that he represented defendant as counsel at her trial and at her capital sentencing hearings. Copp noted that he did not obtain Lembke's 1979 report or defendant's Michael Reese Hospital records, and his failure to do so was not a matter of trial strategy. He stated that if he had obtained Lembke's report and the Michael Reese records, he would have provided those documents to the defense experts.

The trial court dismissed all of the claims of defendant's amended petition without an evidentiary hearing. From that dismissal, defendant appeals to this court. See 134 Ill. 2d R. 651(a).

ANALYSIS

The Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1998)) provides a means by which a defendant may challenge his conviction for violations of federal or state constitutional rights. *People v. Orange*, 195 Ill. 2d 437, 447 (2001). An action seeking post-conviction relief is a collateral proceeding, not an appeal from the underlying judgment. *People v. Evans*, 186 Ill. 2d 83, 89 (1999). To be entitled to post-conviction relief, a defendant must establish a substantial deprivation of federal or state constitutional rights in the proceedings that resulted in the conviction or sentence being challenged. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999). Because a proceeding brought under the Act is a collateral attack on a judgment of conviction, all issues actually decided on direct appeal are *res judicata* and all issues that could have been raised in the original proceeding but were not are waived. *People v. Whitehead*, 169 Ill. 2d 355, 371 (1996).

A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right. *People v. Whitehead*, 169 Ill. 2d 355, 370-71 (1996). An evidentiary hearing is warranted only where the allegations of the petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *Morgan*, 187 Ill. 2d at 528. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in accompanying affidavits are taken as true. *Morgan*, 187 Ill. 2d at 528. A trial court's determination regarding the sufficiency of the allegations contained in a post-conviction petition are reviewed *de novo. Morgan*, 187 Ill. 2d at 528.

I. Ineffective Assistance of Counsel

Defendant first contends that she was denied the effective assistance of trial counsel because her attorney

failed to conduct an adequate investigation into mitigation evidence and failed to sufficiently develop evidence that defendant was abused at a young age, was severely neglected by both parents, and suffered from organic brain damage. Defendant claims that if counsel had presented the additional mitigation evidence, along with expert testimony to explain the effect the abuse and brain damage would have had on defendant, there is a reasonable probability that the jury would have found the evidence sufficient to preclude imposition of the sentence of death.

To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). A defendant first must establish that his counsel's performance was so deficient that his representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Once a defendant establishes that his counsel's performance fell below an objective standard of reasonableness, he also must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Defense counsel has a duty to make a reasonable investigation for mitigation evidence to present at a capital sentencing hearing, or he must have a sound reason for failing to make a particular investigation. *People v. Morgan*, 187 Ill. 2d 500, 541 (1999). Nevertheless, review of trial counsel's decisions regarding the presentation of mitigating evidence is highly deferential. *People v. Towns*, 182 Ill. 2d 491, 513-14 (1998). Strategic choices made by defense counsel following a thorough investigation into the law and facts relevant to a defendant's plausible options are virtually unassailable.

*Towns*, 182 Ill. 2d at 514. However, where the lack of mitigating evidence presented at a defendant's trial is not attributable to strategy, but is instead attributable to counsel's failure to properly investigate evidence and to prepare a defense, such deference is not warranted. *Towns*, 182 Ill. 2d at 514.

Even where counsel's performance is deficient due to the failure to investigate mitigating evidence and present it to the jury, the defendant must still demonstrate prejudice to sustain a claim. *People v. Coleman*, 168 Ill. 2d 509, 536 (1995). In evaluating prejudice in the capital sentencing context, the appropriate question is whether there is a "reasonable probability that, absent the errors, the factfinder *** would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69. In making this determination, a court must consider the totality of the evidence, and a death sentence that is only mildly supported by the record is more likely to have been affected by errors in investigating and presenting mitigation than one with overwhelming record support. *Coleman*, 168 Ill. 2d at 536, quoting *Strickland*, 466 U.S. at 695-96, 80 L. Ed. 2d at 698-99, 104 S. Ct. at 2069.

After carefully comparing the proposed additional mitigation evidence and arguments in support of defendant's post-conviction petition with that offered by trial counsel at defendant's sentencing hearing, we conclude that the proposed additional evidence and argument is essentially cumulative of that presented by trial counsel at the sentencing hearing and does not give rise to a reasonable probability that the outcome of the sentencing hearing would have been different.

The jury in this case heard testimony from three different witnesses in mitigation that defendant was abused as a child by her mother. Linda Sobotka testified that

Renee became very violent in her disciplining of defendant after Joseph Jr. died. She noted that, when defendant began school at age five, reports indicated that defendant had many old scars, bruises, and lacerations on her face and body. She also told the jury that there were numerous reports that Renee abused defendant, including that Renee began sexually abusing defendant around the age of five or six by having her engage in oral sex. Joseph confirmed that defendant was physically abused by Renee for a continuous 10-year period, beginning around age five. Dr. Teich likewise recounted defendant's social history and that she had been abused as a child by her mother. This evidence of abuse heard by the jury was significant and was not controverted by any other evidence in the case. We simply do not believe that there is a reasonable probability that presentation of the additional evidence cited by defendant would have resulted in a sentence other than death in view of the awful nature of the crimes in this case and the criminal history and character of defendant.

Although there was no evidence presented by trial counsel that Joseph covered up Renee's abuse, there was evidence that Joseph worked constantly and basically played little part in defendant's life other than attempting to protect her from further rapes by Renee's boyfriends. In that regard, Joseph admitted at the sentencing hearing that he was aware that Renee was abusing defendant as a child and was keeping her home from school so that the abuse would not be discovered. Thus, additional evidence that Joseph covered for Renee's abuse or that he was not a good father and never provided a proper, nonabusive home environment would not have increased the probability of a different verdict.

There was also ample evidence presented in mitigation at the sentencing hearing about defendant's mental capabilities. Dr. Moulthrop noted that the defendant's IQ

was 69, placing her in the mildly mentally retarded range. He testified extensively about the difficulties a person with defendant's mental capacity would have, and explained why the defendant could not have been malingering during his examination. Dr. Teich also testified extensively in mitigation as to defendant's mild mental retardation. Thus, the diagnosis of organic brain damage in the affidavit of Dr. Hess is not compelling enough to suggest the probability of a different verdict.

Defendant's most strenuous argument on appeal is that trial counsel was ineffective in failing to present evidence that defendant was sexually abused before the age of five. She contends that counsel should have retained an expert to explain the effect that such abuse, in the critical and formative years of childhood, would have had on defendant.

Initially, we note that evidence of a turbulent and abusive childhood or of psychological and developmental problems is not inherently mitigating. *People v. Hickey*, 204 Ill. 2d 585, 619 (2001); *People v. Sanchez*, 169 Ill. 2d 472, 491 (1996). A jury receiving such evidence might regard it as aggravating because it suggests that the defendant might present a danger in the future as a result of his or her background. *People v. Montgomery*, 192 Ill. 2d 642, 673 (2000). In the instant case, Dr. Fauteck testified in aggravation that defendant is a sexual sadist, who obtains sexual gratification by inflicting pain and suffering on others. He noted that the condition tends to become aggravated with time and is incurable. The testimony that defendant is a sexual sadist and the suggestion that she is a future threat to society is not contradicted by any of the affidavits or exhibits presented by defendant's post-conviction pleadings. Thus, evidence that defendant was physically and sexually abused during childhood, leading to impulsive or compulsive conduct in connection with the charged offenses, would not neces-

sarily have been viewed as mitigating. Instead, it may very likely have been viewed as aggravating. See *Hickey*, 204 Ill. 2d at 619 (trial counsel was not ineffective in failing to present evidence of the abusive behavior of the defendant's parents where such evidence could suggest defendant might be a danger in the future).

Even if the evidence proposed by defendant could be viewed as mitigating and as necessary corroboration to rebut the State's efforts at trial to minimize the abuse and mental deficiencies suffered by defendant, we do not find that this proffered evidence creates a reasonable probability that the outcome of the sentencing determination would have been altered absent trial counsel's failure to present it. We must assess prejudice in a realistic manner based on all of the evidence. Thus, it is not proper to focus solely on the potential mitigating evidence. *Coleman*, 168 Ill. 2d at 538. As numerous cases illustrate, the nature and extent of the evidence in aggravation must also be considered. *Coleman*, 168 Ill. 2d at 538 (citing a number of decisions of this court and of various federal courts for the principle that the heinous nature of the offense and the presence of various aggravating circumstances may negate a defendant's claim of prejudice in connection with the failure to present mitigating evidence).

Here, we conclude that in light of the overwhelming evidence in aggravation, including the heinous nature of the offenses, there is no reasonable probability that the introduction of the potentially mitigating evidence set forth by defendant's amended post-conviction petition would have altered the jury's sentencing decision. Defendant's crimes were awful in the extreme. Defendant lured a helpless six-year-old child to defendant's apartment, where defendant perpetrated unspeakable acts of horror against the child, ignoring all of the child's pleas for mercy. An expert attributed the child's death to 42

distinct injuries arising from a combination of strangulation, puncture wounds to the chest, and blunt head trauma. Furthermore, the jury heard evidence that over the course of a five- or six-year period, defendant sexually and physically assaulted three other girls, including her own baby. Given the overwhelming aggravating evidence in this case and the arguably cumulative nature of the proposed mitigating evidence, there was no realistic probability that the proposed mitigating evidence would have persuaded the jury that the balance of aggravating and mitigating factors did not warrant the death penalty. See *Coleman*, 168 Ill. 2d at 539.

The Illinois cases relied upon by defendant are distinguishable and do not support her position. In *People v. Orange*, 168 Ill. 2d 138 (1995), this court held that the defendant was entitled to an evidentiary hearing on his claim that trial counsel was ineffective in failing investigate possible mitigating evidence to present at the sentencing hearing. Unlike the present case, however, trial counsel in *Orange* failed to present *any* mitigating evidence even though there was a great deal of mitigating evidence that could have been presented. Moreover, trial counsel in that case admitted that he did not attempt to contact any witnesses in mitigation. The defendant in *Orange*, unlike the instant defendant, had a very limited criminal history, which involved nonviolent crime that occurred more than 15 years earlier (*People v. Orange*, 121 Ill. 2d 364, 386 (1988)).

In *People v. Caballero*, 126 Ill. 2d 248 (1989), this court held that the defendant was entitled to an evidentiary hearing because counsel failed to present mitigation testimony that would have added "considerable cogency and force" to his cause. The reason offered by defense counsel for not presenting the testimony was that the would-be witnesses did not meet defense counsel's criteria for testifying because they failed to

pledge that they were theoretically opposed to the death penalty in all cases. This court observed that "the decision not to introduce possible mitigation simply because the mitigation witnesses do not oppose the death penalty is so strange that we believe an evidentiary hearing to determine the truth of this allegation is required." *Caballero*, 126 Ill. 2d at 282. It was also found to be significant in *Caballero* that defendant had no prior criminal history and had been a model student prior to his crimes. *Caballero*, 126 Ill. 2d at 280. While we recognize that in *Caballero* the defendant's part in the killing of three rival gang members in an act of revenge was reprehensible, the quantum of aggravating evidence in the instant case clearly distinguishes this case from *Caballero*. See *Coleman*, 168 Ill. 2d at 539-40.

*People v. Perez*, 148 Ill. 2d 168 (1992), is likewise distinguishable. There, defense counsel did not conduct *any* investigation into the defendant's background for possible mitigation evidence. Despite having in his possession two scholastic aptitude reports that indicated that the defendant had a full scale IQ of just 62 at age 8 and a full scale IQ of 77 at age 11, defense counsel failed to present this information to the sentencing jury. Additionally, a diligent investigation would have revealed that the defendant was abandoned during childhood by his family. Under these circumstances, this court concluded that there was a reasonable probability that had the jury known of the mitigating evidence that defense counsel failed to investigate and present, it would not have found that the death penalty was warranted. *Perez*, 168 Ill. 2d at 195. In contrast to *Perez*, the sentencing jury in the instant case heard ample evidence in mitigation regarding defendant's mental deficiency and abusive upbringing. The weight of the aggravating evidence also makes the case at bar clearly distinguishable from *Perez*. See *Coleman*, 168 Ill. 2d at 539-40.

In *People v. Morgan*, 187 Ill. 2d 500 (1999), defendant senselessly shot and killed two acquaintances. Unlike the extensive mitigation presented to the jury in the instant case, the mitigation presented by the defense in *Morgan* consisted of two unprepared character witnesses whose testimony comprised only 10 pages of transcript. Defense counsel completely failed to conduct any investigation into defendant's background, which would have revealed the existence of significant mitigation evidence that defendant had an abusive childhood and was afflicted with severe lifelong brain damage and neurological impairments. *Morgan*, 187 Ill. 2d at 546-47, 549. Given these facts, this court determined that a breakdown occurred in the aggravation-mitigation phase of the sentencing proceeding, causing serious doubt as to the propriety of defendant's sentence. *Morgan*, 187 Ill. 2d at 557.

In contrast to the above-discussed cases, defense counsel here presented six witnesses who testified in mitigation at the sentencing hearing and one witness who testified in mitigation at the guilt phase of defendant's trial. The testimony of defendant's two experts alone accounted for a total of 170 pages of transcript. The sentencing jury was presented with significant evidence of defendant's background, abusive childhood, and diminished mental capacity. The additional proposed mitigation was largely cumulative of what had been presented, and the nature of the crime and the aggravating evidence weighed more heavily against the defendant here than it did in the cases discussed above.

We find that the instant case more closely resembles *People v. Coleman*, 168 Ill. 2d 509 (1995). There, the murder entailed a "horrifying and despicable attack on a defenseless child accomplished by deception of the child's mother." *Coleman*, 168 Ill. 2d at 539. We held that "[i]n light of the overwhelming aggravating circumstances,

the introduction of potentially mitigating evidence of defendant's background and mental and emotional health would not have been sufficient to change the jury's sentencing decision." *Coleman*, 168 Ill. 2d at 539. While it could be argued that the aggravating evidence in that case surpasses even the overwhelming nature of the aggravating evidence in the present case, it should also be noted that defense counsel in *Coleman* essentially failed to present any mitigating evidence, while defense counsel in the present case placed ample mitigation before the jury. We find that *Coleman* supports the result here. Accordingly, we hold that the circuit court did not err in dismissing defendant's petition without an evidentiary hearing on the bases discussed above.

II. State's Use of Fitness Examination in Aggravation

Defendant next argues that Dr. Fauteck's testimony concerning the 1991 fitness examination was improperly admitted during the aggravation-mitigation phase of defendant's sentencing hearing. Defendant argues that the admission of Dr. Fauteck's testimony violated her constitutional rights. Relying upon *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), defendant argues that her rights were violated because she was not advised that her statements to Dr. Fauteck during the examination could be used against her.

As previously noted, the scope of post-conviction relief is limited, through considerations of waiver and *res judicata*, to "constitutional matters which have not been, and could not have been, previously adjudicated." *People v. Winsett*, 153 Ill. 2d 335, 346 (1992). Defendant raised, and this court rejected, the same argument on defendant's direct appeal. See *Pulliam*, 176 Ill. 2d at 279-81. In the prior appeal, this court found that defendant had waived the issue by failing to object either at trial or at the sentencing hearing, and the issue did not amount to plain error. *Pulliam*, 176 Ill. 2d at 278-80. This court

further rejected defendant's ineffective assistance of counsel claim in connection with trial counsel's failure to object at trial and at sentencing. *Pulliam*, 176 Ill. 2d at 278, 280. Because defendant's arguments were raised and rejected in the prior appeal, they are now barred by the principle of *res judicata*. *Orange*, 195 Ill. 2d at 458.

Nevertheless, defendant argues that post-conviction relief is not precluded on this issue, claiming that the proposed additional mitigation evidence she supplies with her post-conviction petition demonstrates prejudice when considered cumulatively with the improper testimony about the fitness evaluation. We disagree.

Initially, we note that defendant is mistaken in her assumption that Dr. Fauteck's testimony was improper. In the course of its plain error analysis on direct appeal, this court cited *Buchanan v. Kentucky*, 483 U.S. 402, 97 L. Ed. 2d 336, 107 S. Ct. 2906 (1987), and noted that "because defendant was the first to introduce psychiatric evidence, admission of testimony concerning the fitness examination did not deprive her of a fundamental right." *Pulliam*, 176 Ill. 2d at 280. We continue to adhere to that statement. Defendant's reliance on *Estelle* is unavailing. As we observed in *People v. West*, 137 Ill. 2d 558 (1990), "[t]he [United States Supreme] Court subsequently limited the breadth of *Estelle* to 'the "distinct circum-stances" of that case' when it decided *Buchanan*." *West*, 137 Ill. 2d at 591, quoting *Buchanan*, 483 U.S. at 422, 97 L. Ed. 2d at 355, 107 S. Ct. at 2917.

In *Estelle*, a court-appointed psychiatrist went beyond simply reporting to the court on the issue of competence based on his examination of the defendant and testified for the prosecution at the penalty phase of the capital sentencing hearing on the crucial issue of the defendant's future dangerousness. *Estelle*, 451 U.S. at 467, 68 L. Ed. 2d at 372, 101 S. Ct. at 1875. The Court held that in such a situation, the defendant's fifth amendment rights

were violated by the failure to administer to the defendant, before the examination, the warning required by *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). *Estelle*, 451 U.S. at 466-69, 68 L. Ed. 2d at 371-73, 101 S. Ct. at 1874-76.

The Court in *Estelle*, however, specifically noted that the defense did not offer any psychiatric testimony at trial. *Estelle*, 451 U.S. at 466, 68 L. Ed. 2d at 371, 101 S. Ct. at 1874. *Buchanan* distinguished *Estelle* on that basis, holding that the prosecution may constitutionally offer evidence from a court-ordered fitness examination when the defendant presents psychiatric or "mental status" evidence. *Pulliam*, 176 Ill. 2d at 280; *West*, 137 Ill. 2d at 591-92. Moreover, the Court noted that when defense counsel agrees to a court-appointed examination, it is presumed that counsel understands the ramifications of placing the defendant's mental status at issue. *Buchanan*, 483 U.S. at 424-25, 97 L. Ed. 2d at 356-57, 107 S. Ct. at 2918-19.

In the case at bar, Dr. Fauteck was appointed by the court at the behest of defendant to conduct the examination. Thereafter, it was defendant who first introduced mental competence and psychiatric testimony into the case. See *Pulliam*, 176 Ill. 2d at 278, 280. Accordingly, we find that no error occurred. We further find that even if the introduction of Dr. Fauteck's testimony could be deemed improper, it did not amount to plain error given the nature of the overwhelming aggravating evidence presented against defendant. Defendant's proposed mitigation does not alter that conclusion.

### III. Prejudicial Impact of Book Cover Shown at Sentencing

Defendant next argues that her appellate counsel was ineffective in failing to argue that she was prejudiced at sentencing by the introduction of a book discovered by police in her apartment entitled The Force of Sex. At

trial, the State was allowed to show the jury the cover of the book in question over defense counsel's objection. This court held on appeal that the trial court erred in admitting the book into evidence, but the error was harmless because the properly admitted evidence of defendant's guilt was overwhelming. *Pulliam*, 176 Ill. 2d at 276-77. Defendant now argues that appellate counsel was ineffective in failing to raise the matter in connection with any prejudicial impact the book might have had at sentencing because the "very title of the book corroborates the prosecution's theory in aggravation that [defendant] is a sexual sadist."

As noted, claims of ineffective assistance of counsel based on deficient representation of a criminal defendant are assessed in accordance with the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). Where it is possible to resolve an ineffective assistance claim on the basis of the second prong of the test—that the defendant suffered no prejudice as a result of counsel's allegedly defective performance—the claim may be decided against the defendant without consideration of whether counsel's performance was actually deficient. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069. Again, the second prong of *Strickland* requires the defendant to establish that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Here, we conclude that the omissions upon which defendant bases her ineffective assistance claim did not result in prejudice within the meaning of *Strickland*. The jury was permitted to view only the cover of the book at trial. The book was not presented to the jury at sentencing, and the jury was not allowed access to the book during any of its deliberations. More importantly,

the defendant does not contest the label "sexual sadist" that was placed upon her by the State's expert. Indeed, defendant ostensibly adopts the diagnosis of sexual sadism through the report of Dr. Berlin presented with her post-conviction petition, but argues that it should be considered a mitigating factor. Under these circumstances and in light of the overwhelming aggravating evidence presented by the State, we do not find that there is a reasonable probability that the result of the sentencing proceeding would have been altered in the absence of the error in showing the book cover to the jury at trial.

## IV. Verdict Form

Defendant next argues that her death sentence must be vacated and the cause remanded for a new sentencing hearing because the verdict form used for the felony-murder aggravating factor improperly omitted the requisite mental state as set forth in section 9—1(b)(6) of the Criminal Code of 1961 (the Code) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6)). Defendant maintains that her trial and appellate attorneys were ineffective for failing to raise the issue.

Defendant's argument is without merit. This court has repeatedly held that where a jury finds a defendant death-eligible based upon multiple aggravating factors, the jury's determination will be upheld if at least one of the verdict forms is valid. *People v. Buss*, 187 Ill. 2d 144, 226-27 (1999); *People v. Terrell*, 185 Ill. 2d 467, 503-04 (1998); *People v. Macri*, 185 Ill. 2d 1, 57-58 (1998); *People v. Jackson*, 182 Ill. 2d 30, 67-69 (1998); *People v. Williams*, 181 Ill. 2d 297, 320-22 (1998). Here, defendant was found eligible for the death penalty based on the additional aggravating factor that the murder victim was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(7)). There is no question that the jury's verdict

form was valid with respect to the presence of this aggravating factor.

*People v. Terrell*, 185 Ill. 2d 467 (1998), is directly on point and controls the outcome here. In *Terrell*, the defendant argued that the jury improperly found him eligible for the death penalty because the verdict form omitted the required mental state for eligibility under section 9—1(b)(6). This court held, however, that the jury's verdict based on the aggravating factor set forth in section 9—1(b)(7) independently established the defendant's eligibility for the death penalty regardless of the validity of the verdict on the felony-murder aggravating factor of section 9—1(b)(6). *Terrell*, 185 Ill. 2d at 504.

Defendant's reliance upon *People v. Ramey*, 151 Ill. 2d 498 (1992), and *People v. Mack*, 167 Ill. 2d 525 (1995), is misplaced. In *Ramey*, the jury instruction used for the felony-murder aggravating factor omitted the requisite mental state. In reversing the defendant's death sentence, this court noted that a defendant can be found eligible for the death penalty only if the jury unanimously finds that the State had proven beyond a reasonable doubt the existence of at least one of the eight statutory aggravating factors. *Ramey*, 151 Ill. 2d at 544. Because the requisite finding had not been made by a trier of fact at any other stage of the proceeding, the defendant was entitled to a new sentencing hearing. *Ramey*, 151 Ill. 2d at 544-47. *Ramey*, of course, does not alter the rule that a defendant can be found death-eligible as long as an independent aggravating factor is properly found to exist.

*People v. Mack*, 167 Ill. 2d 525 (1995), is also distinguishable. In *Mack*, this court remanded for a new death eligibility hearing because of a similar defect in the verdict form. *Mack*, 167 Ill. 2d at 538. *Mack*, however, did not involve a situation like the present case where other aggravating factors supported the jury's sentence.

As additional matter, we note that the defendant contends that section 9—1(b)(7) of the Code is unconstitutionally vague. We rejected precisely the same argument in defendant's direct appeal. *Pulliam*, 176 Ill. 2d at 286-87. This court has repeatedly upheld section 9—1(b)(7) against similar vagueness challenges since first considering the issue 14 years ago. See, *e.g.*, *Terrell*, 185 Ill. 2d at 502-03; *People v. Jackson*, 182 Ill. 2d 30, 62-64 (1998); *People v. Fair*, 159 Ill. 2d 51, 80-82 (1994); *People v. Odle*, 128 Ill. 2d 111, 139-41 (1988). Defendant cites no case law to support her argument, and we decline to reconsider our previous rulings here.

V. Response to Question From Jurors

Defendant next argues that the trial court erred in its response to a note the jury sent to the judge during the course of its deliberations at the penalty phase of defendant's sentencing hearing. After deliberating for 2¹/₂ hours, the jury sent the court the following query: "What happens if we cannot reach a unanimous decision on either verdict?" Defense counsel requested that the court respond to this question by giving the jury the following answer: "According to the law, if you are not unanimous, you are to sign the verdict that says you are not unanimous and it is a no death verdict." The trial court declined the request, and instead instructed the jury in writing as follows: "You have your instructions. Keep deliberating."

In rejecting the same argument on direct appeal that defendant now raises, this court stated:

"We believe that the trial court properly exercised its discretion in refusing defendant's requested instruction and in directing the jury to continue deliberating. Immediately before beginning its deliberations on defendant's sentence, the jury was instructed as follows: 'You may not sign a verdict imposing a death sentence unless you unanimously vote for it.' Because the instructions given to the jury concerning unanimity were readily understand-

able and sufficiently explained the relevant law, we hold that the court did not err in the manner in which it responded to the jury's inquiry." *Pulliam*, 176 Ill. 2d at 285.

Defendant acknowledges that this court rejected her same argument on direct appeal, but now contends that *res judicata* should not be invoked to bar her claim because her amended post-conviction petition raises new matters outside the record to support her argument. In that regard, defendant offers (1) a 1996 magazine article explaining the 1994 study of Shari Diamond, a study which analyzes possible juror confusion over death penalty jury instructions, (2) the United States Supreme Court's decision in *Weeks v. Angelone*, 528 U.S. 225, 145 L. Ed. 2d 727, 120 S. Ct. 727 (2000), and (3) the decision of this court in *People v. Alvine*, 173 Ill. 2d 273 (1996).

Turning first to the 1994 Diamond study, we note that it cannot be characterized as a new matter. The study was available at the time of defendant's direct appeal. See *People v. Brown*, 172 Ill. 2d 1, 56-57 (1996). Defendant argues in the alternative that if the study was available, appellate counsel rendered ineffective assistance of counsel in failing to present it. We disagree.

Although appellate counsel apparently did not reference the study in that appeal, counsel did argue that the Illinois Pattern Jury Instructions given at both stages of defendant's sentencing hearing unconstitutionally failed to guide the jury's discretion, citing the federal decision in *United States ex rel. Free v. Peters*, 806 F. Supp. 705 (N.D. Ill. 1992). In *Free*, the district court found a similar study by Professor Hans Zeisel persuasive in finding that jurors were confused over Illinois death penalty instructions. However, that ruling was reversed by the Court of Appeals for the Seventh Circuit. *Free v. Peters*, 12 F.3d 700 (7th Cir. 1993). This court on direct appeal in the instant case rejected defendant's argument based on *Free* (*Pulliam*, 176 Ill. 2d at 287), as this court has done with

other similar arguments on numerous occasions (see *Brown*, 172 Ill. 2d at 55-56 (listing 10 cases that have rejected *Free* and the Zeisel study).

In *Brown*, this court also considered and rejected a defendant's argument that confusion in the pattern death penalty instructions rendered them constitutionally infirm. The defendant supported his argument in that case with the Diamond study. This court affirmed the defendant's death sentence, finding the study unpersuasive and refusing to remand for an evidentiary hearing on the matter. *Brown*, 172 Ill. 2d at 56-57; accord *People v. Hobley*, 182 Ill. 2d 404, 467-70 (1998). Given the flaws in the Diamond study noted in *Brown* and *Hobley*, we do not believe that the failure to present the study would have impacted the outcome of defendant's direct appeal. Accordingly, defendant was not prejudiced under *Strickland*.

Defendant also argues that principles of *res judicata* are inapplicable here because the Supreme Court's subsequent decision in *Weeks v. Angelone*, 528 U.S. 225, 145 L. Ed. 2d 727, 120 S. Ct. 727 (2000), amounts to a change in the law. We disagree with defendant's assertion that *Weeks* requires a different outcome in the present case than the one reached on direct appeal. In *Weeks*, the Court considered the question of "whether the Constitution is violated when a trial judge directs a capital jury's attention to a specific paragraph of a constitutionally sufficient instruction in response to a question regarding the proper consideration of mitigating circumstances." *Weeks*, 528 U.S. at 227, 145 L. Ed. 2d at 733, 120 S. Ct. at 729. The *Weeks* Court held that the trial court acted properly, and the constitution did not require anything more. *Weeks*, 528 U.S. at 234, 145 L. Ed. 2d at 738, 120 S. Ct. at 733.

Defendant does not rely upon the holding of *Weeks* but instead relies upon factual differences between that

case and the present one. We do not find, however, that the facts of *Weeks* require a different result here. In *Weeks*, the jury sent the judge a note on the second day of its deliberations asking the following question:

" 'Does the sentence of life imprisonment in the State of Virginia have the possibility of parole, and if so, under [*sic*] what conditions must be met to receive parole?' " *Weeks*, 528 U.S. at 228, 145 L. Ed. 2d at 734, 120 S. Ct. at 730.

The judge answered as follows:

" 'You should impose such punishment as you feel is just under the evidence, and within the instructions of the Court. You are not to concern yourselves with what may happen afterwards.' " *Weeks*, 528 U.S. at 228, 145 L. Ed. 2d at 734, 120 S. Ct. at 730.

Deliberations continued for another five hours, at which point the jury asked the following additional question:

" 'If we believe that [the defendant] is guilty of at least 1 of the alternatives, then is it our duty as a jury to *issue* the death penalty? Or must we *decide* (even though he is guilty of one of the alternatives) whether or not to issue the death penalty, or one of the life sentences? What is the Rule? Please clarify?' " (Emphases in original.) *Weeks*, 528 U.S. at 229, 145 L. Ed. 2d at 734, 120 S. Ct. at 730.

The judge responded as follows: " 'See second paragraph of Instruction #2 (Beginning with "If you find from ...").' " *Weeks*, 528 U.S. at 229, 145 L. Ed. 2d at 734, 120 S. Ct. at 730. The judge explained to defense counsel his answer to the jury's question, noting that his answer could not be made any clearer than the instruction and so he simply referred the jury to the instruction.

When comparing the present case with *Weeks*, we note that the possibility of juror confusion was greater in *Weeks* than in the present case. The question the jury asked the trial court here is similar to the first question asked in *Weeks*. The jurors wanted to know *what would happen* if they could not reach a unanimous decision on either verdict. The answer to that inquiry is that

defendant would receive a sentence other than death, which would lead to the further question, "What would that sentence be?" The trial court in *Weeks* responded to a similar question by referring the jury generally to its instructions. The Court focused only on the second question from the jury in *Weeks* in considering whether the judge's response was appropriate. The jury's second question in *Weeks* essentially showed that it was confused about whether it had discretion not to impose the death penalty even if it had found the presence of one of the statutory aggravating factors necessary to impose death.

In discussing the second jury question, the Court noted that a jury is presumed to follow its instructions. *Weeks*, 528 U.S. at 234, 145 L. Ed. 2d at 738, 120 S. Ct. at 733. It further found it important that after receiving the judge's answer, the jury did not respond that it still did not understand its role. Finally, the Court noted that the jury deliberated for two more hours after receiving the answer so it was unlikely that it thought it was required to give the death penalty upon finding an aggravating circumstance. *Weeks*, 528 U.S. at 235, 145 L. Ed. 2d at 738, 120 S. Ct. at 734.

In the present case, the trial court referred the jury to the constitutionally sufficient instructions, as the trial court did in *Weeks*. Although the jury did not deliberate long after receiving the trial court's response, the jury also did not inform the court that it still did not understand its role. A trial court may exercise its discretion and properly decline to answer a jury's inquiries where the instructions are readily understandable and sufficiently explain the relevant law. *Pulliam*, 176 Ill. 2d at 285. We find nothing in *Weeks* that would change our conclusion on direct appeal that the trial court properly exercised its discretion in responding to the jury and that the instructions given concerning unanimity were not confusing, but were instead readily understandable and

sufficiently explicative of the relevant law (*Pulliam*, 176 Ill. 2d at 285).

Defendant additionally argues that appellate counsel was ineffective in failing to cite *People v. Alvine*, 173 Ill. 2d 273 (1996), for the proposition that instructions may be found to be confusing to the jury even though those instructions are otherwise legally valid. Defendant does not sufficiently explain how this case would alter our conclusion on direct appeal that the instructions at issue were not confusing. We find *Alvine* to be factually distinguishable and unhelpful to the plaintiff's argument. Accordingly, we do not find that counsel was ineffective in failing to cite *Alvine*.

VI. Hearing Required on Defendant's Mental Capacity

Lastly, we note that the United States Supreme Court recently held in *Atkins v. Virginia*, 536 U.S. 304, 153 L. Ed. 2d 335, 122 S. Ct. 2242 (2002), that the execution of mentally retarded criminals is excessive and violates the eighth amendment of the United States Constitution (U.S. Const., amend. VIII). *Atkins* was decided after the parties filed their briefs in the instant case. Although there was some evidence in the record that defendant may be mildly mentally retarded, the parties did not address the issue of whether a mentally retarded criminal can be executed. Applying *Atkins* to the present case, we hold that the instant cause must be remanded to the circuit court for an evidentiary hearing to determine whether defendant is mentally retarded.

In *Atkins*, the Court noted in a footnote the definitions of mental retardation as defined by the American Association of Mental Retardation (AAMR) and the American Psychiatric Association (APA), and stated that " '[m]ild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." *Atkins*, 536 U.S. at 308 n.3, 153 L. Ed. 2d at 342 n.3, 122 S. Ct. at 2245 n.3. In another footnote, the Court stated

that "[i]t is estimated that between 1 and 3 percent of the population has an IQ between 70 and 75 or lower, which is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." *Atkins*, 536 U.S. at 309 n.5, 153 L. Ed. 2d at 342 n.5, 122 S. Ct. at 2245 n.5. The Court further stated the following:

> "[C]linical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 318, 153 L. Ed. 2d at 348, 122 S. Ct. at 2250.

In *Atkins*, the Court recognized that there was conflicting evidence in the record on the issue of whether Atkins was in fact mentally retarded. The defense expert evaluated Atkins prior to trial and concluded that he was mildly mentally retarded. His conclusion was based on a review of court and school records and the administration of the Wechsler Intelligence Test, which indicated that Atkins had a full scale IQ of 59. The State, on the other hand, presented an expert witness in rebuttal, who opined that Atkins was not mentally retarded, but was of average intelligence, at least. The State's expert did not administer an intelligence test.

In remanding the cause to the Supreme Court of Virginia for further proceedings not inconsistent with its opinion, the *Atkins* Court stated the following:

> "To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, 477 U.S. 399 (1986), with regard to insanity, 'we leave to the State[s] the task of developing

appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.' 477 U.S. 399, 405, 416-417 (1986)." *Atkins*, 536 U.S. at 317, 153 L. Ed. 2d at 347-48, 122 S. Ct. at 2250.

In *Ford v. Wainwright*, 477 U.S. 399, 91 L. Ed. 2d 335, 106 S. Ct. 2595 (1986), which *Atkins* cites as authority for leaving to the States the " 'appropriate ways to enforce the constitutional restriction upon [their] execution of sentences,' " the Supreme Court declared that the execution of insane inmates violates the eighth amendment. *Atkins*, 536 U.S. at 317, 153 L. Ed. 2d at 348, 122 S. Ct. at 2250, quoting *Ford*, 477 U.S. at 416-17, 91 L. Ed. 2d at 351, 106 S. Ct. at 2605. In that case, the Court remanded the *habeas corpus* proceeding of a Florida state death-row inmate to a federal district court for a *de novo* evidentiary hearing on the question of competence to be executed. *Ford*, 477 U.S. at 416-18, 91 L. Ed. 2d at 351-52, 106 S. Ct. at 2605-06.

As noted above, *Atkins* was decided after both briefing and oral argument had concluded in this case. Moreover, defendant has not sought leave to supplement this appeal with any arguments relating to *Atkins*. Nevertheless, we clearly recognize the relevance of *Atkins* to this case. Indeed, as in *Atkins*, the experts in this case expressly disagreed on the question of whether defendant was mildly mentally retarded; defendant's expert testified that she was, and the State's expert testified that she was not. More importantly, in light of this disagreement between the experts, we recognize that the filing of a subsequent post-conviction petition asserting *Atkins* is inevitable, and that a hearing on that petition will be necessary. Consequently, in the interests of judicial economy, we choose to remand this cause to the circuit court for a *de novo* evidentiary hearing to determine whether defendant is mentally retarded and therefore, under *Atkins*, may not be executed.

As a final matter, we emphasize that this case is before us on review under the Post-Conviction Hearing

Act. The appropriate remedy here is simply a remand for a hearing under *Atkins*. It would not be appropriate for this court to usurp the authority of the legislature by fashioning procedural and substantive standards in relation to the *Atkins* hearing. Such matters are best left to the determination of the legislature following discussion and debate. The legislature may choose to eventually adopt procedural standards to govern *Atkins* issues that arise prior to conviction and sentence. We recognize that the circuit courts will have to conduct these hearings, at least for the time being, without definitive guidance from the legislature or from this court. In the meantime, we will review all such cases, including post-conviction cases, to ensure that due process standards have been satisfied.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County dismissing defendant's post-conviction petition without an evidentiary hearing is affirmed in part and reversed in part. In light of *Atkins*, we remand the cause for a *de novo* evidentiary hearing before the circuit court to determine whether defendant is mentally retarded.

*Affirmed in part and reversed in part;*
*cause remanded.*

JUSTICE RARICK took no part in the consideration or decision of this case.

JUSTICE KILBRIDE, concurring in part and dissenting in part:

The majority correctly reverses in part the judgment of the circuit court and remands this cause for an evidentiary hearing in light of the United States Supreme Court decision in *Atkins v. Virginia*, 536 U.S. 304, 153 L. Ed. 2d 335, 122 S. Ct. 2242 (2002). Nonetheless, for the reasons set forth in my dissents in *People v. Hickey*, 204

Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), I believe that the majority fails to grant defendant the constitutionally required relief of a new trial conducted in accordance with the new supreme court rules governing capital cases. The procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not adequately protect a defendant's constitutional rights. Consequently, since the new rules were promulgated to address the deficiencies of constitutional dimension that regularly occurred under the old system, the rules must be applied retroactively to all capital cases. See *People v. Caballero*, 179 Ill. 2d 205, 220-21 (1997).